CITY OF PHILADELPHIA, a municipal corporation; William J. Green, individually and as Mayor of the City of Philadelphia; Marilyn McGinty, Curtis Owens, Rudy J. Arzon, Cecilia M. Yep and John and Mary Doe, individually and as class representatives; William H. Gray, III, individually and as a member of the United States House of Representatives; Max Pievsky, individually and as a member of the House of Representatives of the Commonwealth of Pennsylvania; Joseph F. Smith, individually and as a member of the Senate of the Commonwealth of Pennsylvania

v.

Philip M. KLUTZNICK, Secretary of the United States Department of Commerce; Vincent P. Barabba, Director of the United States Bureau of the Census; United States Department of Commerce; Bureau of the Census, an agency within the United States Department of Commerce; Porter S. Rickley, Regional Director of the Philadelphia Region of the Bureau of the Census of the United States Department of Commerce; Thomas Heuring, District Manager for the 1980 Philadelphia Census.

Civ. A. No. 80–3172.

United States District Court,
E. D. of Pennsylvania.

Nov. 4, 1980.

John E. Flaherty, Jr., Deputy City Sol., Philadelphia, Pa., for plaintiffs.

Alphonse M. Alfano, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

BECHTLE, District Judge.

Presently before the Court is defendants' motion to dismiss the within case which challenges the accuracy and conduct of the 1980 census in the City of Philadelphia. Defendants' motion offers several grounds for dismissal: (1) lack of ripeness; (2) plaintiffs' lack of standing; (3) presence of a nonjusticiable political question; (4) challenges to agency action which are excluded from judicial review; and, (5) failure of plaintiffs to state a claim upon which relief can be granted. For the reasons stated below, the motion was granted in part and denied in part by the Court's Order of October 17, 1980.

## I. BACKGROUND

A proper understanding of the Court's disposition of this motion requires a brief description of the enumeration process, as well as of the relationship between the City of Philadelphia ("City") and the Bureau of the Census ("Bureau"). For the purpose of determining a motion to dismiss for lack of a justiciable controversy and failure to state a claim upon which relief can be granted, the well-pleaded material allegations of the complaint must be taken as admitted. *Miree v. DeKalb*, 433 U.S. 25, 27 n.2, 97 S.Ct. 2490, 2492 n.2, 53 L.Ed.2d 557 (1977); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); 2A *Moore's Federal Practice*, ¶ 12.08 (2d ed. 1980).

### (A) The Census Process

The principal plaintiff in this action is the City of Philadelphia, a municipal corporation. The City is joined by a number of individuals, some of whom are also suing as class representatives, and others who are also suing in their capacities as elected officials. Those suing in their official capacities are: the Mayor of Philadelphia; a member of the United States House of Representatives; a member of the Pennsylvania State Senate; and, a member of the Pennsylvania State House of Representatives. All three legislators represent districts located within the City. The defendants named are: the Bureau; the Department of Commerce, which is the executive department with jurisdiction over the Bureau; and, various Government officials who are responsible, directly or indirectly, for the execution of the 1980 decennial census in Philadelphia.

The United States Constitution requires that a decennial census be taken.[1] By statute, Congress has directed that the census be conducted by the Secretary of Commerce, 13 U.S.C. §§ 141, 142, and has established the Bureau of the Census as the agency within the Department of Commerce to carry out this responsibility. 13 U.S.C. § 2. The census of the population and housing must be taken as of April 1. 13 U.S.C. § 145(a). The determination of the population by states, required for the apportionment of the House of Representatives, must be completed within nine months and reported to the President. 13 U.S.C. § 143(b).[2]

The Bureau also prepares a statistical breakdown of the population by city and local government, which is used in Pennsylvania as the basis for congressional and state legislative reapportionment. *See* Pa. Const. art. 2, §§ 16, 17.[3] As a result of reapportionment based on the 1970 decennial census, the City comprised four complete congressional districts and part of a fifth. At the state level, the City comprised nine state senatorial and thirty-four state representative districts.

Census results are also used in a number of federal and state funding programs which distribute aid to the City and other local governments according to a formula based in part on population counts prepared by the Bureau in connection with the decennial census. The amount of money involved is substantial, being approximately $43 million a year in federal aid for the City and approximately $30 million in state aid.

The census, as conducted by the Bureau in the past, has been basically an unadjusted headcount. In Philadelphia and other locales, this is now achieved by mailing questionnaires to individual households, where a member of the household is requested to complete the questionnaire and return it to the Bureau.

(B) *The Local Review Program*

As part of the 1980 census, the Bureau introduced the Local Review Program, in which local governments could review preliminary population and housing counts for their areas before final figures were released by the Bureau. Where local officials "suspected discrepancies," it was contemplated that the Bureau would "review the discrepancies and initiate the necessary steps to ensure that the postcensus counts are accurate." *U. S. Bureau of the Census, Local Review Program Information Booklet: 20th Decennial Census—1980* (Dec. 15, 1978). Through this program, the Bureau hoped to improve the accuracy of the 1980 census. As described in the Bureau's official booklet, received by the City in February of 1979, the program was to consist of two phases of review: (1) Precensus Local

1. "The actual Enumeration [upon which apportionment is based] shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of Ten Years, in such Manner as they shall by law direct." U.S.Const. art. I, § 2, cl. 3.

2. Upon transmittal of the state population results to the President, the role of the Bureau in congressional reapportionment terminates. Soon after receiving the Bureau's tabulation, the President must transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, ... and the number of Representatives to which each State [is] entitled." 2 U.S.C. § 2a(a). Within 15 days of the receipt of this statement, the Clerk of the House of Representatives must "send the executive of each State a certificate of the number of Representatives to which such State is entitled." 2 U.S.C. § 2a(b).

The actual reapportionment is then enacted by each state, *see, e. g.,* Pa.Const. art. 2, §§ 16, 17, subject to the limitations imposed by the Due Process and Equal Protection Clauses of the United States Constitution. *See Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–530, 11 L.Ed.2d 481 (1964).

3. The Pennsylvania Constitution does not explicitly require that decennial census data be used in reapportionment. However, since the time for framing a reapportionment plan under the Pennsylvania Constitution depends, at least in part, on when "the population data for [Pennsylvania] as determined by the Federal decennial census [becomes] available," Pa. Const. art. 2, § 17(c), the state constitution could arguably be said to require that the reapportionment plan rely on the federal census. *See also* § 17(a), (b).

Review, and (2) Postcensus Local Review. In precensus review, local governments were to review the Bureau's master address list in areas like Philadelphia where the census was to be conducted through the use of mailed questionnaires. A large discrepancy was to be reported to the Bureau, along with a description of the source of the estimate used to determine the discrepancy's existence. Postcensus review, on the other hand, was to take place *after* the April 1 enumeration had been completed. Here, the Bureau would provide local governments with preliminary population and housing counts, and the local governments would then have 10 working days from the date of receipt of this information in which to review the preliminary figures. Any discrepancies were to be reported in writing, again stating the alternative local estimate and describing its source. *See generally U. S. Bureau of the Census, Local Review Program Information Booklet: 20th Decennial Census—1980* (Dec. 15, 1978).

At some time in early 1980, the Bureau revised the Local Review Program. As set forth in the Bureau's booklet received by the City on May 23, 1980, the program was to consist of only one post-census review beginning in June of 1980. Precensus review of the master address list was eliminated. In addition, the geographic level of review was changed from block-level to enumeration district-level.[4] *See generally U. S. Bureau of the Census, Census '80: Revised Local Review Program Information Booklet* (April 1980). The City alleges that these changes rendered the City's preparations "useless."

The enumeration by the Bureau took place as planned on April 1 and, during the post-census period, the City received the preliminary census figures furnished by the Bureau on June 26 and July 8, 1980. The Bureau's count declared the City's population to be 1,607,070. Aside from being far below the City's 1970 census figure of 1,948,609, the count was also 155,000 less

than the City's 1979 population estimate of 1,762,257. In addition, the preliminary post-census results listed more than twice the number of vacant housing units shown by the City's own 1979 estimates. Although the City challenged the preliminary results in several letters to the Bureau, the City claims that it has failed to receive "timely and adequate responses." The City's letters, attached to the complaint as exhibits, suggested the existence of gross discrepancies, particularly in the count of vacant housing units. The Bureau's responses are not attached to the complaint and, therefore, are not before the Court. The City also claims that the Bureau hired "unskilled" enumerators to conduct the census in the first place.

(C) *The Statistical Adjustment Factor*

After the 1960 and 1970 decennial censuses, the Bureau stated that there had been an undercount of the population. The undercount was reported to be more pronounced among minority groups (primarily blacks and Hispanics) and non-English-speaking persons residing in the inner city. *See* Complaint ¶ 53, at 20, *citing U. S. Bureau of the Census, Census of Population and Housing: 1970, Evaluation and Research Program, PHC(E)–4, "Estimates of Coverage of Population by Sex, Race, and Age: Demographic Analysis"* (1973). Nevertheless, the Bureau did not adjust those census figures to compensate for the undercount in the results reported to the President for reapportionment. Moreover, the Bureau recognizes that an undercount is likely to be a problem again in 1980, yet the Bureau does not intend to adjust the results obtained from their headcount. If the undercount is more marked in urban areas as plaintiffs allege, the failure to adjust the results of the headcount will skew reapportionment and revenue-sharing formulas.

(D) *The Procedural History of This Action*

Possessed with this information and with the five Philadelphia district offices sched-

---

4. For the purposes of enumeration, the Bureau divided the City into "enumeration districts."

These are broken down into "block groups" and further into the smallest unit, "blocks."

uled to close on August 15, the City, along with the other named plaintiffs, filed this action on August 12, 1980. The complaint prays for a preliminary injunction as well as final declaratory and injunctive relief.[5] The City also sought a temporary restraining order, concerning which the Court issued an Order on August 14, 1980,[6] directing the Bureau to keep two of the five district offices open until September 2, 1980. That Order also provided for expedited discovery.

Following a discovery conference, this Court issued an Order dated August 20, 1980, which stayed discovery but directed the Bureau to furnish affidavits assuring the Court that the materials sought by the City would be preserved so as to be readily available if production was ordered. The Court also ordered the parties to prepare legal memoranda on the preliminary issues of justiciability raised in the instant motion. After the defendants produced sufficient affidavits, this Court, by Order of September 18, 1980, modified the Order keeping the two district offices open to require only that one office be maintained. Meanwhile, the Court commenced a preliminary injunction hearing on September 3. That hearing was then suspended until September 12, 1980, when the motion discussed herein was argued before the Court. In view of the disposition of this motion, the Court has set November 18, 1980, for resumption of the preliminary injunction hearing.

## II. *LEGAL DISCUSSION*

### (A) *Standing*

■ The defendants first contend that all of the plaintiffs lack standing to maintain this action. The concept of standing is intended to ensure that the proper parties are before the Court, *Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952–1953, 20 L.Ed.2d 947 (1968), by determining whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ Standing to challenge administrative action is governed by § 702 of the Administrative Procedure Act, 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." In *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court held that § 702 is satisfied where "the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," and "the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 152–153, 90 S.Ct. at 829–830. The test of standing involves both constitutional and prudential limitations on the exercise of federal court jurisdiction. *Warth v. Seldin, supra,* 422 U.S. at 498–500, 95 S.Ct. at 2204–2206. The constitutional limitations stem from Article

---

**5.** Count I of the complaint sets forth the injunctive relief sought by the plaintiffs, which includes: (1) enjoining defendants from closing the district offices until October 31, 1980, and directing that defendants maintain adequate staffs at these offices to review the City's data; (2) directing defendants to produce a variety of documents, including the Bureau's master address register listing the address of each dwelling unit enumerated in the 1980 census; and, (3) directing the Bureau to provide "immediate written and complete answers" to the City's letters.

Counts II through IV seek various forms of final relief, including: (1) an injunction order-

ing defendants not to report census statistics for the City to the President until the defendants show that they have corrected their data in response to the City's complaints; (2) an injunction directing the defendants to apply "appropriate adjustment factors" to the City's 1980 population in the Bureau's report to the President to correct for the undercount of minorities; and, (3) equitable relief in the form of adding "identified persons and housing units to presently existing counts" as the City analyzes the Bureau's data.

**6.** United States District Judge Edward R. Becker, sitting in emergency session.

III's requirement that the federal courts entertain only "cases and controversies." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1923–1924, 48 L.Ed.2d 450 (1976); *Warth v. Seldin, supra*, 422 U.S. at 498, 95 S.Ct. at 2204. These constitutional considerations are embodied in the "injury-in-fact" requirement articulated in *Data Processing*, which has since been elaborated upon to require the plaintiff to show "a 'distinct and palpable injury,'" and also that there is "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct" such that "the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 74, 98 S.Ct. 2620, 2630, 2631, 57 L.Ed.2d 595 (1978), *quoting Warth v. Seldin, supra*, 422 U.S. at 501, 95 S.Ct. at 2206, and *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). *See also Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 41–42, 96 S.Ct. at 1925–1926.

The other half of the *Data Processing* test embodies concerns "apart from the 'case' or 'controversy' test." *Association of Data Processing Service Organizations v. Camp, supra*, 397 U.S. at 153, 90 S.Ct. at 829–830. Such "prudential rules . . . serve to limit the role of the courts in resolving public disputes." *Warth v. Seldin, supra*, 422 U.S. at 500, 95 S.Ct. at 2206.

Defendants contend that plaintiffs' injuries are too speculative to constitute the kind of concrete harm required for standing. *See O'Shea v. Littleton*, 414 U.S. 488, 494, 497–499, 94 S.Ct. 669, 675, 676–677, 38 L.Ed.2d 661 (1974). They argue that, before the Bureau determines the final census results and reports them to the President, it is impossible to determine whether they will be biased against the plaintiffs. Furthermore, they argue, since the named defendants do not control how state and federal aid is apportioned, the plaintiffs have failed to show that any adjustment of the census figures will necessarily result in preventing the loss of revenue-sharing funds.

Defendants also rely heavily on *Federation for American Immigration Reform (FAIR) v. Klutznick*, 486 F.Supp. 564 (D.D.C.1980) (three-judge court). Like the courts in *Young v. Klutznick*, 497 F.Supp. 1318 (E.D.Mich.1980), and *Carey v. Klutznick*, No. 80–4550 (S.D.N.Y. filed Oct. 1, 1980), the Court finds that case inapposite. In *FAIR*, the plaintiffs brought an action prior to the taking of the 1980 census to compel the Bureau to note those who were illegal aliens, so that those persons would not be included in the figures used to determine reapportionment. The *FAIR* court held that the plaintiffs lacked standing. The plaintiffs apparently were unable to do more than speculate about the size and distribution of the alien population and, thus, about the effect of judicial relief. The instant case is distinguishable.

First, *FAIR* is clearly inapposite to the issue of the present plaintiffs' standing to challenge the Bureau's conduct of local review. The facts which will establish or fail to establish that the Bureau acted improperly in its conduct of local review exist now and need no time to mature. In *FAIR*, however, the facts needed to show the wrongfulness of the agency's action were statistics which were not then available and which might never have materialized. Second, the plaintiffs here will be able to do better than speculate about the extent and location of the alleged undercount. The Bureau in the past has compiled its own undercount statistics. These might go far toward showing the need for an adjustment. Furthermore, this action was brought *after* the census was taken and, indeed, after the preliminary results were made available to the plaintiffs. Therefore, the undercount, if there is one, is already a part of the 1980 census, giving rise to the kind of concrete injury which gives the plaintiffs standing to pursue this action.

■ As stated earlier, however, the question of standing goes to the propriety of any person seeking adjudication of an issue. Therefore, where an action is brought by multiple plaintiffs and their

standing has been challenged, the Court must inquire into the standing of *each* plaintiff or class of plaintiffs. *See Warth v. Seldin, supra,* 422 U.S. at 502, 508, 510, 95 S.Ct. at 2207, 2210, 2211. Moreover, where a person brings a suit in more than one capacity, it is only reasonable that the Court analyze the standing of that person with respect to each of his capacities.

■ The instant case presents the Court, for the purpose of this motion, with four classes of plaintiffs: (1) the City of Philadelphia, a municipal corporation; (2) the mayor of Philadelphia in his capacity as mayor; (3) a member of each of the United States House of Representatives, the Pennsylvania Senate and the Pennsylvania House of Representatives; and, (4) a number of individual representative residents and citizens of the City, including the aforementioned elected officials in their individual capacities. The Court will analyze the standing of each, mindful of the principle that, in determining whether a plaintiff has shown the requisite standing, the well-pleaded facts of the complaint are to be taken as true. *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206.

### (1) *The City of Philadelphia*

■ The City has alleged that, as a result of the Bureau's failure to conduct the Local Review Program properly and its failure to include an adjustment factor in the final census figures, it will lose both state and federal legislative representatives and state and federal revenue-sharing aid. The Court cannot hold that the loss of representation is an injury suffered by the City, for the loss of representation can only be suffered by the representatives' flesh-and-blood constituency. The Court does hold, however, that the City's allegation of a loss of revenue-sharing aid is sufficient to support the holding that the City has standing to challenge both the failure of the Bureau to properly implement the Local Review Program and the Bureau's failure to include an adjustment factor. *Cf. City of Camden v. Plotkin,* 466 F.Supp. 44, 47–50 (D.N.J. 1978) (loss of revenue-sharing and CETA funding is sufficient injury in fact to allow city to challenge Bureau estimates of city's population).

First, since the allegations of the complaint are taken as admitted for purposes of this motion, the City's allegations that the Bureau's putatively wrongful conduct will result in population counts biased against the City is sufficient to establish the kind of threatened injury required to show standing.

The defendants' argument that the injury is too speculative and that relief is not substantially likely to afford the City redress are wide of the mark. In the first place, the use of census-based population data in the revenue-sharing formulas is deeply entrenched. It is far more "speculative" that the use of the data will be eliminated than that it will be continued. Moreover, the ephemeral possibilities suggested by the defendants cannot compare with the circumstances which the Supreme Court found might have prevented effective relief in *Warth v. Seldin, supra,* 422 U.S. at 504–508, 95 S.Ct. at 2208–2210 (merely invalidating zoning law may not result in the construction of affordable housing for persons of low or moderate income), or *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 43–44, 96 S.Ct. at 1926–1927 (merely requiring the Internal Revenue Service to restore the requirement for tax-exempt status that hospitals must operate to the extent of their financial ability for those not able to pay for the services rendered may not result in hospitals providing more services for poor; hospitals may elect to forego favorable tax status to avoid financial burdens).

In addition, the Court holds that the interest of the City in receiving its fair share of Government aid is arguably within the zone of interests protected by the statute where the City's share depends on the accuracy of the Bureau's work. Therefore, the Court must hold that the City has standing to maintain this suit, based on its claim that it will lose federal and state revenue-sharing funds.

(2) *The Mayor of Philadelphia Qua Mayor*

■ Nowhere in the complaint is there a single allegation of injury in fact, actual or threatened to the Mayor of Philadelphia in his capacity as mayor; nor can the Court conceive of any such injury. Such a defect is fatal and the Court shall, therefore, grant defendants' motion to dismiss as to the Mayor in his official capacity for lack of standing.

(3) *The Legislative Representatives*

■ The only allegation of injury to the three legislative representatives in their official capacity is that they "will be denied due process of law because the undercount of the City's population will result in an inaccurate reapportionment of Congressional and legislative districts." This allegation is insufficient to establish standing. A legislative representative suffers no cognizable injury, in a due process sense or otherwise, when the boundaries of his district are adjusted by reapportionment. To demonstrate that a person has suffered an injury, a person must show that some interest has been infringed. While the voters in a representative's district have an interest in being represented, a representative has no like interest in representing any particular constituency. It is only the voters, if anyone, who are ultimately harmed. Thus, the Court holds that the defendants' motion to dismiss shall be granted as to the three legislative representatives in their official capacities for lack of standing.

(4) *Individuals and Elected Officials as Individuals*

Finally, the plaintiffs include various individuals, including the aforementioned elected officials in their private capacities. The individual plaintiffs allege that the Bureau's undercount and its failure to properly conduct local review will cause the dilution of their votes. They also allege that they will not receive their fair share of revenue-sharing funds.

■ The landmark case of *Baker v. Carr, supra,* firmly established that individuals have an interest in the effectiveness of their votes, and that dilution of their votes constitutes injury in fact. 369 U.S. at 207–208, 82 S.Ct. at 704–705. Furthermore, an undercount in the census, or a failure to properly conduct local review, which results in disproportionately undercounting the Philadelphia population would clearly result in the dilution of the individual plaintiffs' votes. It is equally clear that, if the Court should grant plaintiffs the relief they seek, the strength of their votes would be directly restored.

■ The individual plaintiffs also allege sufficient injury in fact in claiming the loss of the benefits of the millions of dollars in revenue-sharing aid allocated to Philadelphia. Even if none of the named plaintiffs personally receives a dollar of state or federal aid, all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money. Improved transportation, more jobs, cleaner streets—however the money is spent—the results benefit all. Consequently, a loss of a portion of that money is an injury suffered by all. The Court holds, therefore, that on either ground, the individual plaintiffs have alleged injury in fact sufficient to establish standing.

■ Moreover, the interests of individual citizens in full congressional representation and the fair distribution of revenue-sharing funds are clearly within the zone of interests protected by the Census Act and, in regard to apportionment, by the Constitution. *See City of Camden v. Plotkin, supra,* 466 F.Supp. at 50–51. Indeed, the protection of any other interest must be secondary, for it is plain from the language of the Constitution itself that the census was created for the specific purpose of ensuring a fair apportionment of congressional seats. Thus, the Court holds that the individual plaintiffs also have standing.

(B) *Ripeness*

■ To be justiciable by a federal court under Article III, an issue must be ripe for resolution. *See Duke Power Co. v.*

*Carolina Environmental Study Group, Inc.,* *supra,* 438 U.S. at 81, 98 S.Ct. at 2634–2635; *Regional Rail Reorganization Act Cases,* [*Blancette v. Connecticut General Insurance Corps.*] 419 U.S. 102, 138, 95 S.Ct. 335, 355–356, 42 L.Ed.2d 320 (1974). Where a case involves a challenge to the action of an administrative agency, the doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515–1516, 18 L.Ed.2d 681 (1967). To determine whether a controversy is ripe, the Court must "evaluate both the fitness of the issues for judicial determination and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515–1516.

Defendants argue that plaintiffs' claims cannot ripen until after the final tabulation of the census results in late-December, 1980. They reason that, since no use of the results can occur before that time, only then can the Court determine whether any of the relief sought by the plaintiffs is appropriate.

The Court disagrees and holds that, for the reasons set forth below, the case is ripe.

### (1) *Ripeness of Review of the Bureau's Actions in Local Review*

The Local Review Program has officially been completed. The issue now is whether the Bureau's conduct of that program, as established by the evidence, violated appropriate legal standards. Since these issues do not focus as much on the accuracy of the numbers obtained as the procedure used to obtain them, they will never be more sharply defined tomorrow than they are today. The issues regarding the conduct of the program are thus now fit for resolution.

Furthermore, the hardship to the parties which would result from delaying consideration of these issues until after final certification counsels in favor of immediate resolution. The value of local review is the opportunity it creates for the Bureau to check the accuracy of the preliminary census results before they are accepted as final. For example, discrepancies revealed by comparing the Bureau's results with the City's estimates may require reexamination or follow-up in the field. By 1981, however, the Bureau will long since have released the experienced temporary employees who would best perform such field work. To wait until the figures are final would thus largely eliminate the value of the program.

### (2) *The Undercount*

The ripeness of the City's claim that the Bureau must include an adjustment factor in the final census results presents a more difficult question. Nevertheless, the Court holds that this issue is also ripe for resolution.

The defendants argue that the existence and size of a 1980 undercount must be finally determined before the issue of an adjustment may be resolved. The Court disagrees. In the first place, defendants largely base their refusal to include an adjustment factor on their interpretation that the Constitution and the Census Act prohibit the use of such a factor. Such issues, presenting only questions of law, are perfectly suitable for judicial resolution. *See Abbott Laboratories v. Gardner, supra* at 149, 87 S.Ct. at 1515–1516. In addition, the role of the Court under the principles of review established today is merely to ensure that the Bureau has not acted arbitrarily or capriciously in deciding not to include an adjustment factor. The facts upon which this determination is to be made exist now. Accordingly, for both reasons, the issue is fit for adjudication.

Moreover, postponing resolution until final certification of the figures to the President would cause hardship to the parties because, if an adjustment to the raw census results *is* warranted, it should occur *before,* not after, the results are certified to the President. In thus holding this controversy

to be ripe, the Court notes its finding agrees with that of *Carey v. Klutznick, supra,* slip op. at 14–16.

## (C) *Political Question*

Defendants also contend that the plaintiffs' claims raise a nonjusticiable political question. In *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. at 710, the Court outlined the scope of the political question doctrine:

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

The defendants' principal argument is that there is a textually demonstrable constitutional commitment of the census to the Congress, free of judicial review, in Art. I, § 2, cl. 3 of the United States Constitution. That clause provides that: "[t]he actual Enumeration shall be made ... within every subsequent Term of ten Years, in such Manner as [Congress] shall by law direct."

The Court holds that this phrase does not constitute the textually demonstrable commitment intended by *Baker v. Carr.* As *Baker v. Carr* used it, the phrase was intended to refer to those matters of Government which the Constitution suggests by its wording and overall scheme are peculiarly the responsibility of another branch of Government. *See Powell v. McCormack,* 395 U.S. 486, 518–522, 89 S.Ct. 1944, 1962–1964, 23 L.Ed.2d 491 (1969). The defendants have advanced no reason why concepts of separation of powers should forbid the courts from reviewing the conduct of the census. The scant history of the constitutional provision suggests that the Framers sought only to protect the census from possible local bias and manipulation by vesting responsibility for its undertaking in the national Government. *See* 1 *The Records of the Federal Convention of 1787,* 580 (M. Farrand ed. 1911). There is, however, no indication of any similar reason why, within the federal government, it should be the exclusive responsibility of Congress and not subject to judicial review.

The defendants' other political question arguments are similarly without merit. As this Court has resolved the issues below, there is no lack of judicially discoverable or manageable standards. However, the issues to be tried are limited to the standard of review of administrative action. Such standards are certainly "well developed and familiar." *Cf. Baker v. Carr, supra* at 226, 82 S.Ct. at 715 (noting that judicial standards under the Equal Protection Clause were sufficiently well developed to apply to apportionment statutes). Nor would the Court, under the principles and limited standards outlined here, have to become entangled in the day-to-day managerial decisions of the Bureau.

■ For all of these reasons, the Court holds that the claims do not present a nonjusticiable political question.

## (D) *Judicial Review*

■ Defendants argue that the matters of which plaintiffs seek review are committed to agency discretion by law and are, therefore, not subject to judicial review. For the reasons below, the Court disagrees.

Whether the challenged actions of the Bureau are subject to judicial review is controlled by the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"). The

APA provides that any aggrieved person shall be entitled to judicial review "[e]xcept to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Since there is no statutory provision explicitly prohibiting judicial review of the Bureau's actions, the Court must determine whether the challenged agency actions are committed to agency discretion by law.

The Supreme Court has emphasized that "the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation," and that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 140–141, 87 S.Ct. at 1511, *quoting Rusk v. Cort,* 369 U.S. 367, 379–380, 82 S.Ct. 787, 794–795, 7 L.Ed.2d 809 (1962). Thus, the APA embodies a "basic presumption of judicial review." *Abbott Laboratories v. Gardner, supra,* 386 U.S. at 140, 87 S.Ct. at 1511. *See also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820–821, 28 L.Ed.2d 136 (1971). In light of these and other decisions of the Supreme Court, the United States Court of Appeals for the Third Circuit has recently interpreted § 701(a) of the APA to restrict judicial access "only where a fair appraisal of the entire legislative scheme, including a weighing of the practical and policy implications of reviewability, persuasively indicates that judicial review should be circumscribed." *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574, 578 (3d Cir. 1979). The Third Circuit then articulated two factors bearing on a determination of whether a particular agency action is nonreviewable: (1) whether the agency has *broad* discretionary powers, such as might suggest that the challenged decision is the product of political, military, economic or managerial theories that are not susceptible to judicial review; and, (2) whether the challenged actions "involve a considerable degree of expertise of experience . . . at least where there are no discernible guidelines and against which the agency decision may be measured." *Id.* at 578–579.

The defendants largely base their argument for nonreviewability on the language of the Census Act stating that "[t]he Secretary [of Commerce] shall . . . take a decennial census of population . . . *in such form and content as he may determine,* including the use of sampling procedures and special surveys." 13 U.S.C. § 141 (emphasis added). While this does clearly suggest that the Bureau's actions are subject only to limited review, it does not constitute the clear and convincing evidence needed to proscribe all judicial review whatever.

This is especially true in light of the practical and policy implications of reviewability in this case. The census is more than a statistic. It is an essential element in the democratic process. To hold that the agency charged with its tabulation is not subject to judicial review is to hold that the Bureau is free to adopt any numbers, regardless of bias, manipulation, fraud or similarly grave abuse, which is exactly the type of conduct and temptation the Framers wished to avoid by entrusting the census to the federal government. This cannot be.

Moreover, such a holding does not necessarily conflict with the Census Act. The Court believes that the limited standards of review defined in this opinion neither curtail the Bureau's statutory authority nor encroach upon areas of the Bureau's expertise. Therefore, the Court holds that the Bureau's actions in this matter *are* subject to judicial review. *Cf. Borough of Bethel Parl v. Stans,* 449 F.2d 575, 578–579 (3d Cir. 1971) (reviewing the Bureau's decision to enumerate college students according to their college residence without discussing nonreviewability); *City of Camden v. Plotkin, supra,* 466 F.Supp. at 51–53 (holding that the Bureau's actions in determining population estimates is subject to limited judicial review).

As the Supreme Court has observed, however, "the existence of judicial review is only the start: the standard for review must also be determined." *Citizens to Preserve Overton Park v. Volpe, supra,* 401

U.S. at 413, 91 S.Ct. at 822. To determine the applicable standard of review, the Court turns again to the APA. Section 706 provides that a reviewing court may "hold unlawful and set aside ... agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). The Supreme Court has most recently elaborated upon the "arbitrary and capricious" standard in the following terms:

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra,* at 416 [91 S.Ct. at 823–824.] The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 245–246, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 283–284, 95 S.Ct. 438, 440–441, 42 L.Ed.2d 447 (1974). In a similar vein, the Third Circuit similarly stated:

> Under the "arbitrary and capricious" standard, the district court sits neither as a fact finder nor as a judge of the weight of the evidence. The task of the court, however, is not to routinely endorse agency action but rather to review thoroughly the administrative record to insure that a rational basis exists for the agency's action. If such a rational basis exists the inquiry must end there and the wisdom of the agency's action is of no further judicial moment.

*Lukens Steel Co. v. Klutznick,* 629 F.2d 881 at 886 (3d Cir. 1980).

 A narrow standard of review is particularly appropriate in this case. The accuracy of various statistics is often the focus of biased, heated and complex argument. Those who challenge them attack both the method of collecting raw data and the method of adjustment used to achieve the final result. In the execution of the census, these disputes are best resolved not by the courts but by the Bureau itself, whose experience with prior censuses and expertise in the collection and analysis of statistical information render it especially qualified to make the appropriate decisions. *See Local 2855 AFGE (AFL–CIO) v. United States, supra,* 602 F.2d at 578; 4 K. Davis, *Administrative Law Treatise,* §§ 30.08–30.-09 (1958).

The Court finds further support for its deferential standard of review in the explicit language of the Census Act. The statute provides that the Secretary—and, in turn, the Bureau—shall conduct the census "in such form and content as *he* may determine." 13 U.S.C. § 141 (emphasis added). While the Court concludes that this provision does not forbid *all* judicial review, the broad language of the provision strongly suggests that Congress sought to give the Bureau wide latitude in deciding how best to conduct the census. *See Local 2855 AFGE (AFL–CIO) v. United States, supra,* 602 F.2d at 579; 4 K. Davis, *Administrative Law Treatise,* §§ 30.08, 30.10 (1958).

 Lastly, the Court believes that strong political considerations also favor but limited interference by the Judicial Branch. While some local governments may have the financial and personnel resources necessary to mount a challenge to the work of the Census Bureau, most, in all likelihood, do not. While some local governments may have a variety of well-

kept source records from which to launch such a challenge, most, in all likelihood, do not. The Framers themselves, nearly 200 years ago, recognized these dangers. As one delegate to the Constitutional Convention of 1787 stated, "[t]he census must be taken under the direction of the General Legislature. The States will be too much interested to take an impartial one for themselves." 1 *The Records of the Federal Convention of 1787*, 580 (ed. M. Farrand 1911) (remarks of Mr. Randolph). As the Framers · in their wisdom clearly foresaw, the unique yet necessary and favored advantage of a federal census is the uniformity—nationwide—of its method; which, by avoiding the possibility of local bias, prevents the result from suffering the Nation's distrust. To allow local governments to gain control over the national census by applying to the courts for readjustment, recalculation, substitution and replacement of the Bureau's figures and techniques under the guise of judicial review is to sacrifice the national program to the exact dangers of local manipulation and bias, no matter how well intentioned, the Founders sought to avoid. So, while the Bureau may not fulfill its duty arbitrarily, capriciously or fraudulently, it nevertheless should be afforded wide latitude to select its methods, techniques and by those means to arrive at its own result. If the course it chooses meets the standard of being free of arbitrariness, capriciousness or fraudulent conduct, it matters not that some local interest contends it has a "better way," or even a higher or lower count.

### (E) *Failure to State a Claim*

Having determined the applicable standard of review, the Court now turns to the complaint to determine whether the City has stated a claim upon which relief can be granted. The Court will look separately at the two claims asserted.

### (1) *Local Review*

In their complaint, plaintiffs point to a variety of defects in the Bureau's revised Local Review Program and claim that these have combined to result in a preliminary census which grossly understates the City's true population. At the outset, the Court notes its agreement with the defendants' general proposition that the Bureau has sole discretion for determining whether state and local governments should participate in the census and, if so, the extent of that participation. *See* 13 U.S.C. § 141(a). The census is a peculiarly *federal* responsibility. It was so designed to protect congressional apportionment, for which it was created, from any possibility of the influence of local bias.[7] The words of the Constitution reflect this when they speak of the census being conducted "in such Manner as [Congress] shall by law direct." U.S.Const., art. I, § 2, cl. 3. Thus, whether, and to what extent, state and local governments may participate in the census is entirely a matter of congressional discretion. Since Congress has delegated to the Bureau its authority to determine the manner in which the census is to be taken, these questions of local participation are to be answered within that agency.

However, *once* the Bureau opened the door—that it was entitled to keep closed—to a local review program, its freedom to slam that door by abolishing or altering that program must be subject to certain restraints. Here, the City claims that the Bureau's various alterations of the Local Review Program early in 1980 rendered the City's preparation "useless." If the Bureau has indeed so drastically altered the Local Review Program it once believed to be proper, and apparently necessary and desired, so as to substantially deprive the City of the realistic opportunity to offer data for comparison with the Bureau's preliminary census results, then the Court may well find the Bureau's action to reach an arbitrary and capricious level so that it

---

**7.** Indeed, the wisdom of the Founders may be borne out by the current plethora of legal attacks upon the census. In this regard, the Court notes that it has yet to hear of the census being challenged because of a population *over*count.

results in an abuse of discretion. Whether the Bureau's actions will be held to substantially deprive the City of this realistic opportunity will be determined by comparing the data the City could have produced under the Local Review Program, as it was originally planned, with data the City could reasonably have produced under the Local Review Program as revised.[8]

The City also claims that the Bureau has failed to give "meaningful" responses to those submissions the City was able to make. The Court holds that such claims are sufficient to withstand a motion under Fed.R.Civ.P. 12(b)(6), but only to the extent that the Bureau's responses are in fact arbitrary or capricious or, in other words, where the Bureau has offered no rational basis for its actions. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra*, 419 U.S. at 283–284, 95 S.Ct. at 440–441; *Lukens Steel Co. v. Klutznick, supra*, at 886. For example, if the City has offered housing estimates based on the number of housing permits issued, and the Bureau's experience and response was that the Bureau had considered such data in the past and had found it unreliable, that would, if true, constitute action supported by a rational basis and would not be subject to further judicial scrutiny. On the other hand, if the Bureau refused to consider such data and it was clear that the Bureau had no experience with that type of data, the Court would surely consider such an irrational refusal to be arbitrary and capricious in the absence of some other redeeming evidence.

The City claims, too, that the Bureau hired "unskilled enumerators" who were insufficiently trained. This claim must be dismissed. Review of this allegation would involve the Court in second-guessing the managerial decisions of the Bureau. The Court can conceive of no rea-

sonable test which would give proper regard to the expertise and experience of the Bureau in hiring its own employees, except under such circumstances that would be so shocking as to defy the most fundamental expectations of rational normal behavior—such as, hiring 10-year-old children or persons who could not read. This is, thus, a prime example of a matter "committed to agency discretion by law" under 5 U.S.C. § 701(a) because there is "no law to apply." *See Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 410, 91 S.Ct. at 820–821, *quoting S.Rep.No.* 752, 79th Cong., 1st Sess., 26 (1945). The Court holds, therefore, that the City's claim complaining of the failure of the Bureau to hire sufficiently skilled enumerators with proper training shall be dismissed.

### (2) *The Undercount*

The plaintiffs' complaint also alleges that the Bureau has acted arbitrarily and capriciously in refusing to apply an adjustment factor to the City's 1980 population figures. Plaintiffs argue that, since the Constitution requires an enumeration of "the whole Number" of persons, U.S.Const., art. I, § 2, cl. 3, statistical adjustments may be made where the result would be a more accurate determination of that number. Plaintiffs also argue that the Census Act not only permits, but "encourages" or "directs," the Bureau to make adjustments in the figures used for reapportionment. The Bureau, however, argues that the Constitution permits nothing other than a headcount and excludes the use of statistical adjustments. Moreover, they argue, Congress has clearly rejected the use of an adjustment figure in the Census Act.

Turning first to the issue of the constitutional limitations on the use of statistical adjustments, the Court observes

---

**8.** With future hearings in mind, the Court notes that the City had notice of local review by early 1979 at the latest. The City's complaint itself also shows that the City was well aware of the evidence of undercounts in the 1960 and 1970 censuses. Therefore, the City will not be heard to argue that the elimination of precensus re-

view prevented the City from being alerted to the likelihood of an undercount in 1980. Rather, the City must show that the elimination of that phase of local review somehow interfered with the ability of the City to compile the data at all.

that the principal concern of the Framers in the constitutional provision at issue was not the manner of conducting the census. Their chief concern was the apportionment of seats in the House of Representatives, as is plain by its provisions. The census is merely a tool for that achievement. Moreover, in the nearly 200 years since the institution of the census, the Nation has experienced not only phenomenal population growth, but startling increases in urban population density as well. It *may* be that today an actual headcount cannot hope to be an accurate reflection of either the size or distribution of the Nation's population. If so, it is inconceivable that the Constitution would require the continued use of a headcount in counting the population. Therefore, the Court holds that the Constitution permits the Congress to direct or permit the use of statistical adjustment factors in arriving at the final census results used in reapportionment.[9]

Defendants contend, however, that, even if the Constitution permits Congress to use statistical adjustment in the final determination of the census, Congress has not permitted the Bureau to do so. Specifically, defendants argue that § 195 of the Census Act precludes the use of statistical adjustment factors in the decennial census. Section 195 provides:

> Except for the determination of population for apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.

13 U.S.C. § 195.

The Court disagrees with the defendants' interpretation. Section 141 of the Census Act authorizes the Bureau to determine the form and content of the decennial census, which may "includ[e] the use of sampling procedures and special surveys." Such techniques may include, at the discretion of the Bureau, the use of statistical adjustments.

■ Moreover, § 195 is consistent with such an interpretation. It *requires* the Bureau to use sampling whenever feasible, except in determining the population for purposes of apportionment. Thus, although the Bureau is not *required* to make statistical adjustments, it is not expressly *prohibited* from doing so. Such a conclusion is also consistent with the legislative history of the 1976 Amendments to §§ 141 and 195. Act of Oct. 17, 1976, Pub.L.No. 521, 94th Cong., 2d Sess., 90 Stat. 2459. That history suggests a congressional intent to *increase* the use of statistical sampling in the Bureau's operations. *See* S.Rep.No. 1256, 94th Cong., 2d Sess. 4, 6, *reprinted in* [1976] *U.S.Code Cong. & Ad.News*, pp. 5463, 5466, 5468. Therefore, the Court holds that the Census Act permits the Bureau to make statistical adjustments to the headcount in determining the population for apportionment purposes.

■ However, the decision whether or not to *use* such techniques again returns us to the right of the Bureau to exercise broad discretion in considering this tool. Therefore, in order to prevail in this case, plaintiffs must show that the Bureau's decision not to do so was arbitrary and capricious as those terms have been defined above.

### III. *SUMMARY*

The Court has held that only the City and the individual plaintiffs suing as individuals have standing to maintain this action challenging the 1980 census in Philadelphia. Furthermore, the Bureau is subject to limited judicial review in its conduct of the decennial census, but only to the extent of determining whether the challenged actions were arbitrary and capricious.

This Memorandum Opinion is in support of the Court's Order dated October 17, 1980.

---

**9.** It is, nevertheless, also reasonable to assume that another purpose of calling for an "actual Enumeration" was to ensure that apportionment would be based on numbers more reliable than population estimates. Therefore, while statistical adjustment factors may be used in arriving at the final census figures, the Constitution would appear to require that the census at least be based on raw data obtained by an actual headcount.