DISTRICT OF COLUMBIA, Plaintiff,

v.

UNITED STATES DEPARTMENT OF COMMERCE, et al., Defendants.

Civ. A. No. 91–0151.

United States District Court, District of Columbia.

April 3, 1992.

Jacob R. Walker, Office of the Corp. Counsel, Washington, D.C., for plaintiff.

Sandra Schraibman, Paul W. Bridenhagen, U.S. Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Before the Court are Defendants' Motion to Dismiss or, in the Alternative for Summary Judgment, and the Plaintiff's Motion

for Summary Judgment. Plaintiff District of Columbia seeks a determination that the Bureau of the Census' inclusion of Lorton Correctional Facility inmates in the 1990 Census as residents of Virginia rather than of the District of Columbia violates the Constitution and the Census Act, 13 U.S.C. §§ 4, 5.

Plaintiff claims violations of Article 1, Section 2, Clause 3 of the Constitution; Article 1, Section 9, Clause 4 of the Constitution; the 5th Amendment; and the Census Act, 13 U.S.C. §§ 4, 5.

Defendants [1] claim that the case must be dismissed because it constitutes a non-justiciable political question, the resolution of which is best left to other branches of government. Further, defendants argue that the Bureau's application of the usual residence rule to Lorton inmates is a rational decision that is not arbitrary and capricious.

We hold that this case is justiciable in this Court and that it does not constitute a political question. We also find that the Bureau's continued application of the usual residence rule to Lorton does not rise to the level of arbitrary and capricious conduct. Therefore, we deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment.

## I. *Background*

The Constitution from the beginning has mandated a decennial census for the purpose of apportioning Representatives to Congress, "in such manner as they [the Congress] shall by law direct." U.S. Const. Art. 1, § 2, cl. 3. Congress has delegated its authority to the Secretary of Commerce, pursuant to 13 U.S.C. §§ 5, 141. The Secretary of Commerce is permitted to delegate his authority to conduct the Census to the Bureau of the Census, 13 U.S.C. § 4.

During the 1990 Census, the Census Bureau applied its "usual residence rule" on April 1, 1990, to enumerate Lorton prisoners as residents of Virginia. Under the "usual residence rule", the Census Bureau counts persons at the place in which they generally eat, sleep, and work. People who are temporarily absent from that place are still counted as residing there. For example, people on a short vacation or trip on Census Day will still be enumerated at their usual place of residence. The usual residence principle derives from the requirements set forth in the First Census Act, 1 Stat. 101 (passed in 1790). That statute required that persons be enumerated according to their "usual place of abode" and that persons without a permanent residence be counted where found. *See* Declaration of Paula J. Schneider ("Schneider Dec."), Chief of the Population Division of the Census Bureau, ¶¶ 6–17, filed in Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss, or In the Alternative for Summary Judgment ("Defendants' Memorandum") Attach. 1. The usual residence for census purposes is not necessarily the same as legal residence or voting residence. Defendants' Memorandum at 6.

In addition, the Census Bureau has developed a set of special enumeration and residence rules for specific population groups in order to adhere to the usual residence principle. Schneider Dec. at ¶ 19. These categories include persons in the armed forces; college students; persons on maritime ships; migrant workers; and persons living in group quarters, including prisons. Schneider Dec. at ¶ 20. Residents of group quarters are enumerated as residents of the locality where the quarters are located, instead of where they would have been living if not resident in the group quarters. Schneider Dec. at ¶ 25. The inmates at Lorton prison have been enumerated for Census purposes as Virginia residents since 1916, when the prison was established. Defendants' Memorandum at 8.

Plaintiff without elaboration alleges that the practice of counting Lorton residents as

---

**1.** Defendants in this suit include the United States Department of Commerce; Robert A. Mosbacher, the Secretary of the Department; Michael Darby, Under Secretary for Economic Affairs of the United States Department of Commerce; the Bureau of the Census ("Bureau"); Barbara Bryant, Director of the Bureau; and William Hill, the Regional Director of the Bureau.

Virginia residents instead of District of Columbia residents will cause the District of Columbia to lose $60 million in federal funds over the next ten years.

## II. *Political Question and Justiciability*

■ Defendants posit that whether Lorton inmates are counted as District of Columbia residents or Virginia residents is a non-justiciable political question.

The Supreme Court delineated the parameters of the political question doctrine in the landmark case of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Baker*, the Court held justiciable a claim that a 1901 state apportionment statute violated equal protection by diluting the votes of some citizens. The Court noted that a political question is distinguished by the relationship between the judiciary and the coordinate branches of government and that it is essentially an issue of separation of powers. 369 U.S. at 210, 82 S.Ct. at 706.[2]

The Court in *Baker* outlined six factors that contribute to a determination of whether a case is justiciable or not:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without

expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710 (brackets and numerals supplied).

We now turn to whether any of these factors are "inextricable from the case at bar" such that this case must be dismissed as non-justiciable. 369 U.S. at 217, 82 S.Ct. at 710.

Upon brief examination, this case seems to involve several of the factors cited in *Baker*. The first factor to consider is whether there is a textually demonstrable constitutional commitment to another political department. We cannot ignore that Article I, Section 2, Clause 3 of the Constitution entrusts the taking of the Census to the Congress, a "coordinate political department." The history of this section of the Constitution[3] suggests that the Framers among other things sought to protect the national census from local bias by entrusting it to the national government. *See City of Willacoochee v. Baldrige*, 556 F.Supp. 551, 557 (S.D.Ga.1983); *City of Philadelphia v. Klutznick*, 503 F.Supp. 663, 674 (E.D.Pa.1980); *Young v. Klutznick*, 497 F.Supp. 1318, 1326 (E.D.Mich. 1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982).

But, as many courts have noted, the constitutional basis for the jurisdiction of Con-

---

**2.** *Baker* involved redistricting at the state level and resulted in a finding that state redistricting was judicially reviewable. The Court was faced with the fact that unless it intervened, the entrenched political control by one party which resulted from the state redistricting statute could never be challenged.

**3.** The constitutional provision reads:
Representatives and Direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indi-

ans not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.
U.S. Const. art. I, § 2, cl. 3.
Section 2 of the Fourteenth Amendment amended that provision and further directs:
Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.
U.S. Const. amend. XIV, § 2.

gress over the conduct of the Census does not provide a reason in every case to shield the Census from judicial review.[4]

Other *Baker* factors are ostensibly present as well. For example, if we were to require the Census Bureau to include Lorton residents as District of Columbia residents, Virginia would necessarily lose a corresponding number of residents. This case has ramifications beyond those stated by plaintiffs. The application of the usual residence rule could well be called into question by states which bear some of the cost for prisoners located in out-of-state penitentiaries.[5] The level of support a locality needs to provide in order to "claim" residents for census purposes is clearly a decision for which there are no judicially manageable standards available. Similarly, there are a myriad of possible methods of conducting a census but no direction as to which is superior. *See, e.g., Tucker v. United States Department of Commerce,* 958 F.2d 1411, 1417–18 (7th Cir.1992) ("So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a case like this—so that you might as well turn it over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness."). Multifarious pronouncements from various courts are possible[6] as other localities may be encouraged to challenge provisions in residence rules that they believe might lower their population counts, undermining the application of usual residence rules and the integrity of the overall census.[7]

Although a brief examination indicates that plaintiffs may make out a colorable claim that the application of the usual residence rule to Lorton inmates constitutes a political question, we will not decline to hear this case on political question grounds. We make this decision because we are unable to distinguish this case from cases challenging the census in apportionment cases where the Supreme Court has held that the issues are justiciable. Further, to hold that this case is non-justiciable would be to rely on a somewhat shaky doctrine and depart from the practice of

---

4. *See City of Philadelphia,* 503 F.Supp. at 674 ("There is, however, no indication of any similar reason why, within the federal government, it should be the exclusive responsibility of Congress and not subject to judicial review."); *City of Willacoochee,* 556 F.Supp. at 557 ("While the Constitution may grant Congress the exclusive power to determine the *manner* in which the census is to be conducted, the Court finds no support for the argument that the Framers intended that all aspects of the conducting of the census be exclusively within the province of the Congress and exempt from judicial review."); *City of New York v. United States Department of Commerce,* 739 F.Supp. 761, 765 (E.D.N.Y.1990); *Young,* 497 F.Supp. at 1324.

5. Defendants claim that private prisons or prisons where the state pays a *per diem* are similar to this case. *See* Defendants' Memorandum at 10–11. In those cases the host state of the prison also funds the institution in some way. *See infra.*

6. The three-judge panel in *Massachusetts v. Mosbacher* dismissed this charge by asserting that the ultimate decision will be that of the Supreme Court, "[a]nd there will be no multiplicity of ultimate judgment in this area." 785 F.Supp. 230, 243–44 (D.Mass.1992), *petition for cert. filed* (Mar. 18, 1992), *stay granted, Franklin v. Massachusetts,* —— U.S. ——, 112 S.Ct. 1551, 118 L.Ed.2d 201 (1992). The panel commented that the danger of multifarious pronouncements for different courts "is a danger that arises whenever a congressional enactment of nationwide impact is open to examination in various *nisi prius* venues." *Id.*

7. Senator Moynihan raised the issue of a multiplicity of suits challenging the Census when he introduced legislation to adjust the 1990 Decennial Census counts:

 The Constitution provides that the census shall be made "in such manner as [Congress] shall by law direct." If we do not exercise our constitutional responsibility, the courts will be forced to resolve the undercount problem. However, the prospect of another 50–plus lawsuits challenging the 1990 decennial census is not likely to satisfy either the Bureau or its critics. As the Federal district court in *City of Philadelphia v. Klutznick* observed, allowing the courts to address this issue on an ad hoc basis "sacrifice[s] the national [census] program *to the exact dangers* of local manipulation and bias, no matter how well intentioned, the framers sought to avoid."

 137 Cong.Rec. S649 (daily ed. Jan. 14, 1991). This acknowledgement that disputes might end up in court is yet another argument against holding that a challenge to the census is a non-justiciable political question.

many other courts. Whether or not to hear this case is a close question, clearly raising many of the concerns enunciated by the *Baker v. Carr* Court, and we believe that prudential reasons alone would be sufficient to decline jurisdiction. However, in light of the questions we have about the applicability of the doctrine, we prefer to reach the merits of this case.

We find it difficult to distinguish challenges to the Census Bureau's practices on apportionment grounds from challenges for financial reasons. *Baker* itself involved a state reapportionment that relied upon the federal Census, *see Baker v. Carr*, 369 U.S. 186, 191, 82 S.Ct. 691, 696, 7 L.Ed.2d 663 (1962), and the Court indicated that issues involving congressional elections would also be justiciable. *Id.* at 233–34, 82 S.Ct. at 718–19; *cf. United States Department of Commerce v. Montana*, —— U.S. ——, ——, 112 S.Ct. 1415, 1426, 118 L.Ed.2d 87 (U.S.1992) ("Our previous apportionment cases concerned States' decisions creating legislative districts; today we review the actions of Congress. Respect for a coordinate branch of Government raises special concerns not present in our prior cases, but those concerns relate to the merits of the controversy rather than to our power to resolve it"). In 1986, the Supreme Court found that a claim of gerrymandering was justiciable and not barred by the political question doctrine. *See Davis v. Bandemer*, 478 U.S. 109, 124, 106 S.Ct. 2797, 2806, 92 L.Ed.2d 85 (1986). If the Constitution did not provide the textual commitment to another branch that would render the issue concerning the political question doctrine non-justiciable in *Baker* or *Davis v. Bandemer*, or the recent *United States Department of Commerce v. Montana*, it is unclear why it should in this case.

Lower courts have similarly held that these cases are justiciable. For example, the Eastern District of New York recently decided that a challenge to the 1990 Census seeking a statistical adjustment did not constitute a political question. *See City of New York v. United States Department of Commerce*, 739 F.Supp. 761 (E.D.N.Y.

1990). The court relied in part on an earlier district court opinion:

> "While *Carey v. Klutznick* involves a challenge to the census, and not precisely a challenge to congressional redistricting, the former provides the foundation for apportionment and redistricting and, therefore, the precedents sustaining challenges to congressional redistricting should afford a predicate for finding the claims before the court justiciable."

*City of New York*, 739 F.Supp. at 765 (quoting *Carey v. Klutznick*, 508 F.Supp. 404, 411 (S.D.N.Y.1980) (citation omitted)).

Although the only case to involve a challenge to the Bureau's residence rules did not consider the political question doctrine,[8] other census cases have discussed the concerns raised by that issue. Most recently, the Northern District of Illinois dismissed as a political question a lawsuit seeking to force the Secretary and the Bureau to adjust statistically the 1990 Decennial Census counts in order to correct an alleged differential undercount of certain population groups. *See Tucker v. United States Department of Commerce*, 135 F.R.D. 175 (N.D.Ill.1991) ("Mem. Op."), *aff'd*, 958 F.2d 1411 (7th Cir.1992). The district court noted that the only issue before it was whether the Bureau was doing what it should to conduct the most accurate census practicable. The court summarized the focus of its concern by noting that "[t]he question is which of the coordinate branches is best equipped to deal with plaintiffs' concern." Mem. Op. at 13.

After reviewing the *Baker v. Carr* decision, the court noted that the case had nearly all the characteristics of a non-justiciable political question, including the delegation by the Constitution to Congress, the lack of judicially manageable standards, and the fact that Congress was the body with the best ability to decide policy. Mem. Op. at 15–16.

The Seventh Circuit affirmed the district court's decision, but in so doing, Judge Posner called into question the political

---

**8.** *See Borough of Bethel Park v. Stans*, 449 F.2d 575 (3d Cir.1971).

question rationale for non-justiciability of the case:

> We have our doubts whether, as the district judge believed, the political questions doctrine is a bar to such a suit. The scope, rationale, provenance, and legitimacy of the doctrine remain profoundly unclear. Perhaps after such cases as *Baker v. Carr* and *Davis v. Bandemer*, all that is left is the unexceptionable proposition—undeserving of the dignity of a special doctrine—that the federal judiciary is not permitted to adjudicate questions that the Constitution has placed within the exclusive jurisdiction of another branch of government, or to disregard traditional limitations on equitable relief. The accuracy of the decennial census is not, in any sense apparent to us, one of those questions; nor are the plaintiffs asking for a form of relief that would exceed the bounds of traditional equity power. And whatever the current scope of the political questions doctrine may be, we would have difficulty squaring the application of the doctrine to this case with its rejection in the apportionment cases. Not that this is an apportionment case, or governed by those cases; it is not, as we shall see; but the political sensitivities that might have been thought to bring the apportionment cases within the scope of the political questions doctrine, but did not, are no greater here.

*Tucker v. United States Department of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992) (citations omitted).

The political question doctrine has come under consistent attack, with many parties arguing for a reevaluation in the wake of *Baker v. Carr*, decided slightly over thirty years ago. *See* 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3534.1 at 468 (2d ed. 1984) ("Rather than attempt to foreclose critical examination of future cases by invoking political question doctrine, it is better to rule simply that the present circumstances do not violate any constitutional standards that the Court may one day be able to apply to other circumstances"); Paul M. Bator, Daniel J. Meltzer, Paul J. Mishkin & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 288–94 (3d ed. 1988); Louis Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976); Wayne McCormack, *The Justiciability Myth and the Concept of Law*, 14 Hastings Const.L.Q. 595, 614 (1987); Robert F. Nagel, *Political Law, Legalistic Politics: A Recent History of the Political Question Doctrine*, 56 U.Chi.L.Rev. 643 (1989); Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv.L.Rev. 1, 9 (1959); *but see* J. Peter Mulhern, *In Defense of the Political Question Doctrine*, 137 U.Pa.L.Rev. 97 (1988) (political question doctrine is largely concerned "with distinguishing cases in which courts will exercise their power of judicial review from those in which they will not.")

However, this Circuit just last year upheld the viability of the political question doctrine. The Court held that the political question doctrine barred hearing a claim for judicial review of impeachment procedures used by the Senate. *See Nixon v. United States*, 938 F.2d 239, *reh. denied*, (D.C.Cir.1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 1158, 117 L.Ed.2d 406 (1992). The Court noted that although the Supreme Court has rarely applied the political question doctrine in recent years, "it has also declined the several opportunities available to dispatch it." *Id.* at 246.

We note as well that the Supreme Court will hear argument this term on a case in which a three-judge panel found that the Census Bureau acted arbitrarily and capriciously by including in the 1990 census federal personnel stationed abroad as residents of their home state of record. One of the questions presented in the statement of jurisdiction is whether "judicial review of the apportionment of Representatives, based on the census including federal personnel stationed abroad, is barred by virtue of the political question doctrine".[9] Juris-

---

9. The Supreme Court just reaffirmed that the method by which Representatives are apportioned among the States following each decennial census is judicially reviewable and does not

dictional Statement at 1, *Franklin v. Massachusetts,* —— U.S. ——, 112 S.Ct. 1551, 118 L.Ed.2d 201. The Supreme Court may well shed some light on the political question doctrine and its possible application to the numerous cases reported to lurk in the wings as a result of the 1990 Census.

Further, we find support in the decisions of other courts that have held that claims about census procedures are justiciable. *See, e.g., Massachusetts v. Mosbacher,* 785 F.Supp. 230 (D.Mass.1992), *petition for cert. filed* (Mar. 18, 1992), *stay granted, Franklin v. Massachusetts,* —— U.S. ——, 112 S.Ct. 1551, 118 L.Ed.2d 201 (1992); *City of New York v. United States Department of Commerce,* 739 F.Supp. 761, 765 (E.D.N.Y.1990); *City of Willacoochee v. Baldrige,* 556 F.Supp. 551, 557 (S.D.Ga. 1983); *Carey v. Klutznick,* 508 F.Supp. 404, 411 (S.D.N.Y.1980); *City of Philadelphia v. Klutznick,* 503 F.Supp. 663, 674 (E.D.Pa.1980); *Young v. Klutznick,* 497 F.Supp. 1318, 1326 (E.D.Mich.1980), *rev'd on other grounds,* 652 F.2d 617 (6th Cir. 1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); *see also Borough of Bethel Park v. Stans,* 449 F.2d 575 (3d Cir.1971) (reviewing Board's decision without discussing justiciability). Although we find that this case does not constitute a political question that would bar our hearing it, we admit that this is a close question, and there are authorities on both sides. We turn now to the merits and consider whether the Census Bureau's decision was arbitrary and capricious.

III. *Standard of Review*

 Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551– 52, 91 L.Ed.2d 265 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, inferences drawn from the factual material must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

 Decisions of administrative agencies are subject to review in federal court under a standard that examines whether the decision was arbitrary and capricious. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); Administrative Procedure Act, 5 U.S.C. § 706(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." 463 U.S. at 43, 103 S.Ct. at 2867. A *de novo* review of the facts underlying the decision is not appropriate although the court must " 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. at 2867 (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)); *Cooperative Services, Inc. v. United States Department of Housing & Urban Development,* 562 F.2d 1292, 1295 (D.C.Cir. 1977). With this standard in mind, we now turn to whether the Census Bureau's decision was arbitrary and capricious.

IV. *Arbitrary and Capricious?*

 Plaintiff charges that the application of the usual residence rule in counting the inmates at Lorton is arbitrary and capricious "because the Bureau fails to consider the uniqueness of the Lorton property and the District of Columbia." Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion, and in Support of Plaintiff's Motion for

constitute a non-justiciable political question. *See United States Department of Commerce v.*

*Montana,* —— U.S. ——, ——, 112 S.Ct. 1415, 1425–26, 118 L.Ed.2d 87 (1992).

Summary Judgment ("Plaintiff's Memorandum") at 2. Plaintiff asserts that the Lorton property is distinguished from other prisons located outside the jurisdiction of their management by the "unique ceding of land to the United States by Virginia." Plaintiff's Memorandum at 10.

Congress for many years has been deeply involved in the establishment of the facility at Lorton. In 1909, the Commissioners of the District of Columbia were authorized to purchase two tracts of land in Virginia or Maryland of at least 1000 acres each to be used for a reformatory and a workhouse. *See* Act of Mar. 3, 1909, ch. 250, 35 Stat. 688, 717 (Mar. 3, 1909) (District's appropriations act for year ending June 30, 1910). Congress directed that the titles to the land be taken in the name of the United States. *See* Act of August 5, 1909, ch. 7, 36 Stat. 118, 122. Land was purchased or acquired by condemnation from 1914 through 1953 for the Lorton prison. Congress created and vested the Board of Public Welfare of the District of Columbia with "complete and exclusive control and management" of "the reformatory at Lorton in the State of Virginia." *See* Act of March 16, 1926, ch. 58, §§ 2, 6, 44 Stat. 208, 208–09. Those powers were later transferred to the Department of Corrections for the District of Columbia, Act of June 27, 1946, ch. 507, 60 Stat. 320 (currently codified at D.C.Code § 24–442 (1989)), and in 1952, to the Board of Commissioners. *See* Reorganization Plan No. 5 of 1952, §§ 1–2, 66 Stat. 824. Reorganization Plan No. 3 of 1967 transferred these powers to the Commissioner of the District of Columbia, *see* Reorganization Plan No. 3 of 1967, § 401, 81 Stat. 948, 951, and in 1973, the Mayor was vested with all the functions granted to or vested in the Commissioner of the District of Columbia as established by Reorganization Plan No. 3 of 1967. *See* District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. 93–198, § 423, 87 Stat. 774, 790 (1973) (codified as amended at D.C.Code § 1–244 (1991)). Consequently, plaintiff argues that "the Mayor of the District of Columbia is vested by Congress with complete and exclusive control and management of the Occoquan and Lorton, Virginia properties, even though legal title to these properties is with the United States." *See* Plaintiff's Memorandum at 12.

But retention of control and management, despite United States ownership, does not automatically qualify a property as "unique" such that it deserves different rules for the Census enumeration. There are numerous properties owned by the United States for which the population is enumerated as residents of the state in which the property is located. Other federal prisons are enumerated in the state in which the institution is located. *See* Schneider Dec. at ¶¶ 24, 35. Nor is the usual residence rule confined to federal prisons. Military establishments, for example, or other residential installations are frequently owned by the United States and yet the residents are rightfully counted as residents of the state within which the installation is located. What may distinguish Lorton from these is that a different political subdivision is given exclusive control over the services offered within the property. At Lorton, for example, the District of Columbia is responsible for maintaining the grounds, completely financing the facility, and providing social services for the residents. *See* Plaintiff's Memorandum at 14–15. Virginia's only connection to the facility is that it is within the geographic boundaries of the state and Virginia can not collect taxes from businesses or residences that otherwise might have been there.

Plaintiff also argues that Lorton is unique because the District of Columbia bears all of the costs of its management. Plaintiff's Memorandum at 15. To this end, plaintiff attempts to distinguish from this case *Borough of Bethel Park v. Stans,* 319 F.Supp. 971 (W.D.Pa.1970), *aff'd,* 449 F.2d 575 (3d Cir.1971), in which the Third Circuit upheld the usual residence rule as applied to college students, members of the armed forces, and institutionalized inmates. Plaintiff points to language in the District Court opinion in which the court noted that the persons in question received services from the communities and would not necessarily return to their "home" states:

In each of these cases, the persons in question draw upon the services of the communities in which their military installations, colleges and institutions are located. The communities in which these persons are residing must plan and develop their public resources to provide for all residents. No abuse of discretion is found in enumerating these persons as inhabitants of these communities rather than as residents of a presumptive home to which many may not be expected to return. Moreover, there is no reason why different criteria should be applied to these persons than are applied to the population at large, many of which may have a status which may be characterized as equally transient on the date of the census.

319 F.Supp. at 979. Plaintiff would distinguish *Bethel Park* by arguing that the District of Columbia pays all of the costs of maintaining Lorton, including water and electricity. Further, the District is liable for Lorton's operation, and the inmates retain District of Columbia residency for health, social and educational benefits. Plaintiff's Memorandum at 14–15. Plaintiff contends that as the District of Columbia completely bears the burden of these residents but yet does not receive any of the benefits from federal assistance based on census enumeration, the usual residence rule should not apply.[10] Unlike the case with regard to college students or military personnel, the locality that contains the Lorton facility does not bear the cost of providing police services or street cleaning.[11]

In one light, this would appear to be a convincing argument. If Lorton was, in fact, a part of the District of Columbia as defined by political boundaries then the inmates would be enumerated as District of Columbia residents. It appears that all that separates Lorton residents from being counted as District of Columbia residents is a mere vagary of the District of Columbia's strange position as a city without a state.

But however rational it may seem to examine the source and nature of fiscal support in such a case, the Census Bureau is not required to do so. Although the Census results are often used to establish levels of federal funding,[12] this is not a defined purpose of the Census. The Constitution makes clear that the Census is to be used to determine congressional representation; it says nothing about financial assistance.[13] And although some courts have noted that the challenges to the Census are motivated by the threat of lost funding,[14] the level of financial support an

10. Defendants argue that plaintiff seems to rely on a claim that the District of Columbia will be disadvantaged to a greater extent than other localities. However, differential impact of census procedures does not prohibit the use of that procedure if it is rationally based. *See West End Neighborhood Corp. v. Stans*, 312 F.Supp. 1066, 1069 (D.D.C.1970).

11. The plaintiffs use the same argument to distinguish private prisons that receive a *per diem* for incarcerated prisoners from outside the state. *See* Plaintiff's Memorandum at 17.

12. *See* Robert H. Freilich, Hugh L. Marshall, & Cynthia Flick, *Urban Problems Regenerated: A Twenty-Year View*, 22 Urb.Law. 537, 541 (1990) ("One hundred billion dollars in federal and state aid is allocated annually based on census data").

In *Baldrige v. Shapiro*, the Supreme Court noted that "[t]he information obtained from the national census is used for such varied purposes as computing federal grant-in-aid benefits, drafting of legislation, urban and regional planning, business planning, and academic and social studies." 455 U.S. 345, 353 n. 9, 102 S.Ct. 1103, 1109 n. 9, 71 L.Ed.2d 199 (1982).

13. *See, e.g., Baldrige v. Shapiro*, 455 U.S. 345, 353, 102 S.Ct. 1103, 1109, 71 L.Ed.2d 199 (1982) ("Although the national census mandated by Art. I., § 2, of the Constitution fulfills many important and valuable functions for the benefit of the country as a whole, its initial constitutional purpose was to provide a basis for apportioning representatives among the states in the Congress.")

14. In *City of Philadelphia v. Klutznick*, 503 F.Supp. 663 (E.D.Pa.1980), the Court found that the City of Philadelphia had standing to challenge the census determination for Philadelphia. The Court noted that the "use of census-based population data in the revenue-sharing formulas is deeply entrenched." 503 F.Supp. at 671.

In *Borough of Bethel Park v. Stans*, 449 F.2d 575 (3d Cir.1971), the appellants asserted that as a result of the usual residence rule, "certain political subdivisions will be denied their proper share of various funds allocated ... according

area receives from a locality has never explicitly defined the census enumeration.

In addition, defendants contend that plaintiff's premise is faulty; they argue that Virginia does bear some of the cost of Lorton's maintenance. For example, the assessor of Fairfax County estimates that if the prison complex was taxable, instead of being exempt as property of the United States, the county real estate tax in 1991 would have been $1.2 million. *See* Affidavit of Paul E. Smith, Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Opposition") Ex. C. Further, defendants allege that the District of Columbia does not compensate the town for some of the costs associated with fire, rescue, and road maintenance.[15] *See* Affidavit of Richard A. King, Acting Coun-

ty Executive of Fairfax County, Va., ¶¶ 9–10, Defendants' Opposition Ex. B.

Judicial review under the Administrative Procedure Act is limited to whether the Census Bureau abused its discretion and acted arbitrarily and capriciously.[16] *See* 5 U.S.C. § 706. Thus, we are not called upon to perform a *de novo* review. All that is before us is whether there is a rational basis for this determination. *See Borough of Bethel Park v. Stans*, 449 F.2d 575, 579 (3d Cir.1971). The procedures used by the Census Bureau do not have to be the best available. *See West End Neighborhood Corp. v. Stans*, 312 F.Supp. 1066, 1069 (D.D.C.1970). Under this standard of review, we find it impossible to say that the Census Bureau acted arbitrarily and capriciously.[17]

to the federal census." 449 F.2d at 577. The appellants had argued that the Bureau improperly had considered the increase on financial burden on the local governments in determining the state in which college students should be enumerated. 449 F.2d at 580. The appellants claimed "that by taking cognizance of such a factor in making a decision, the Bureau deliberately followed a course of action calculated to influence the allocation of federal funds which are based upon census enumerations." *Id.* The Third Circuit assumed *arguendo* that the amount of financial aid was irrelevant to census determinations, but added that it did not appear to be a factor in the Bureau's decision. *Id.*

15. Whether or not the District completely supports Lorton is not determinative nor material to our decision. Consequently, this question of fact will not bar our determining the issue on summary judgment.

16. We note in passing that there is no dispute over the ability of the court to review these actions of the Census Bureau under the Administrative Procedure Act. The nature and extent of such review is the only concern. Where a decision is committed to agency discretion by law, *de novo* judicial review is not permitted. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The statute upon which the Department of Commerce action is based provides that "[t]he Secretary shall ... take a decennial census of population ... in such form and content as he may determine." 13 U.S.C. § 141(a). However, almost every court that has considered the issue has held that 13 U.S.C. § 141 does not preclude judicial review. *See, e.g., Massachusetts v. Mosbacher*, 785 F.Supp. 230, 260–63 (D.Mass.1992), *petition for cert. filed*

(Mar. 18, 1992), *stay granted, Franklin v. Massachusetts*, —— U.S. ——, 112 S.Ct. 1551, 118 L.Ed.2d 201 (1992); *City of New York v. United States Department of Commerce*, 713 F.Supp. 48, 53 (E.D.N.Y.1989); *Carey v. Klutznick*, 637 F.2d 834, 838–39 (2d Cir.1980); *City of Willacoochee v. Baldrige*, 556 F.Supp. 551, 555 (S.D.Ga.1983); *City of Philadelphia v. Klutznick*, 503 F.Supp. 663, 674–75 (E.D.Pa.1980); *Young v. Klutznick*, 497 F.Supp. 1318, 1335 (E.D.Mich.1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); *City of Camden v. Plotkin*, 466 F.Supp. 44, 51–53 (D.N.J.1978); *United States v. Little*, 321 F.Supp. 388, 391 (D.Del. 1971); *Borough of Bethel Park v. Stans*, 319 F.Supp. 971, 976–77 (W.D.Pa.1970), *aff'd* 449 F.2d 575 (3d Cir.1971); *West End Neighborhood Corp. v. Stans*, 312 F.Supp. 1066, 1068 (D.D.C. 1970).

17. The Third Circuit has previously held that the usual residence rule is rational. *See Borough of Bethel Park*, 449 F.2d at 578–79. The Circuit noted that the Constitution required a determination of the "whole number of people in each state", U.S. Const. amend. XIV, § 2, and that the First Decennial Census Act adopted in 1790 interpreted that requirement to embrace those persons whose usual place of residence is a particular state on the date of the census, as well as those persons present in the state who have no usual place of residence. 449 F.2d at 578. The Census Bureau's usual residence standard "is a historically reasonable means of interpreting the Constitutional and legislative phrase 'whole number of persons in each State.'" *Id.* While this case presents a more narrow attack than the facts in *Bethel Park*, the reasoning of the court is equally applicable here. "People in [institutions], as distinguished

To require the Bureau to examine the fiscal links between institutions and the state of residence would add an unreasonable and complicated step to the analysis. The Chief of the Population Division of the Census Bureau, Paula Schneider, indicated that the Bureau does not inquire into factors such as which entity owns or operates an institution, because such an approach would "require the Bureau to engage in complex determinations regarding ownership or maintenance, which the Bureau is not equipped to resolve." Schneider Dec. at ¶ 27.

The Bureau of Census has interpreted the constitutional command to enumerate the whole number of people on Census day to require enumeration at the place where the people are usually to be found. They have developed a series of procedures whereby the state of usual residence receives the benefit of the population.[18] The Bureau has also developed and consistently applied a set of rules for specialized institutions that ascribe residents of these institutions to the state within whose political boundaries the institution is located. This is a determination based on geography. The determination is designed to be administered easily, without in-depth factual analysis. The use of such a rule is a rational determination by the Census Bureau.[19]

To require that the Bureau perform some sort of interest analysis or financial dependence determination in every case would be prohibitively expensive[20] and perhaps not more accurate. To require that the Bureau perform such an analysis only for the Lorton facility would potentially encourage other states to challenge the Census.[21] Although including Lorton within the District of Columbia population may be more equitable, we cannot say that the Bureau acted without a rational basis.

The District of Columbia faces a real problem. The District almost entirely sup-

from, for example, those temporarily in a hospital for a short duration, often have no other fixed place of abode, and the length of their institutional stay is often indefinite." 449 F.2d at 582.

18. The enumeration procedures are the result of extensive analysis and planning. For example, the 1990 procedures were based on previous practice; consultations with agencies, state and local officials, representatives of minority and other organizations, and others; and review and endorsement of the 1990 census plans by both the Executive and Legislative branches. Additionally, the Bureau participated in a conference arranged by the Council of Professional Associations on Federal Statistics, local public meetings, and systematized contact with local governments. *See* Schneider Dec. at ¶¶ 9–15.

While not determinative, Congress may have chosen not to act on this issue. Members of the delegation from the District of Columbia to the House of Representatives proposed a bill that would have included Lorton within the District of Columbia for Census purposes. That bill was referred to the House Committee on the Post Office and Civil Service but no further action was taken. *See* H.R. 5441, the District of Columbia Census Equity Act of 1990, Schneider Dec. Ex. 2.

19. There are other substantial problems with deviation from the usual residence rule. Where would inmates actually be counted, where they lived prior to incarceration? And then what of the current residents of that address? How would they be counted for representation purposes?

20. The cost of the decennial census is already astronomical. Whereas in 1970 the census cost over $221 million to enumerate 203.2 million people, defendants estimate that the 1990 Decennial Census cost $2.6 billion to count 246 million people. Schneider Dec. at ¶ 29.

21. The Eastern District of Pennsylvania noted that permitting local governments to challenge the Bureau's conclusions would ultimately threaten the notion of national control of the census:

To allow local governments to gain control over the national census by applying to the courts for readjustment, recalculation, substitution and replacement of the Bureau's figures and techniques under the guise of judicial review is to sacrifice the national program to the exact dangers of local manipulation and bias, no matter how well intentioned, the Framers sought to avoid. So, while the Bureau may not fulfill its duty arbitrarily, capriciously or fraudulently, it nevertheless should be afforded wide latitude to select its methods, techniques and by those means to arrive at its own result. If the course it chooses meets the standard of being free of arbitrariness, capriciousness or fraudulent conduct, it matters not that some local interest contends it has a "better way," or even a higher or lower count.

*City of Philadelphia v. Klutznick,* 503 F.Supp. 663, 677 (E.D.Pa.1980).

ports a penal population of over 5,000 that is located outside the political boundaries of the District. Because of the way federal funds are distributed, it is likely that the District would receive more money if the Lorton inmates were included as District of Columbia residents. However, the Bureau of the Census did not act without reason. Nor is the District in a unique position here: many states have people whom they support to some degree who are not included as residents for Census purposes, even though those people may vote and consider themselves residents of the state.[22] The solution to the District's problems lies not in adjusting the Census count, but in changing the way funds are distributed.

The Bureau of the Census has decided to use a geographically-based system of enumeration for institutional residents based on usual residence, rather than one based on the financial support of the residents. We cannot say that this is an arbitrary and capricious determination by the Census Bureau, nor does it violate the constitutional command of the census clause. For this reason, we grant defendants' motion for summary judgment on the merits and deny plaintiff's motion for summary judgment.

---

**22.** For example, people who are attending out-of-state schools or serving in the military.