968 F.2d 974
 SENATE OF THE STATE OF CALIFORNIA, David Roberti, Milton
Marks, Stewart Kwoh, Lillian Mobley, Plaintiffs-Appellees,
v.
Robert A. MOSBACHER, United States Department of Commerce,
Barbara Everitt Bryant; Bureau of the Census,
Defendants-Appellants.
 No. 91-55887.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 4, 1992.
Decided July 6, 1992.
 
 Michael S. Raab, U.S.Dept. of Justice, Washington, D.C., for defendants-appellants.
 Robert B. Broadbelt, Michael J. Olecki, Browne & Woods, Beverly Hills, Cal., for plaintiffs-appellees.
 Richard H. Borrow and Jonathan Steinberg, Irell & Manella, Los Angeles, Cal., for amicus.
 Appeal from the United States District Court for the Central District of California.
 Before: PREGERSON, BRUNETTI, and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 The Senate of the State of California, individual state senators, and residents of California (collectively the Senate) brought this action against the Secretary of Commerce (the Secretary). The Senate sought to compel the Secretary to release tapes which contain adjusted census calculations for California. The district court issued a preliminary injunction which directed the Secretary to divulge the tapes to the Senate. We reverse.
 
 BACKGROUND
 
 2
 In 1987, the Department of Commerce notified the public that no statistical adjustment would be made for the 1990 census. In response to litigation brought by the States of New York and California, City of New York v. Department of Commerce, 739 F.Supp. 761 (E.D.N.Y.1990), the Department vacated that decision and conducted a review of the 1990 census to determine if adjusted figures should be released. The Department's post-enumeration survey (PES)[1] determined that over five million people were missed in the 1990 census--an overall undercount of about 2%. Adjustment of the 1990 Census for Overcounts and Undercounts of Population and Housing; Notice of Final Decision, 56 Fed.Reg. 33,582, 33,587 (July 22, 1991) (Adjustment Decision ). Blacks were undercounted by 4.8%, Hispanics by 5.2%, Asian-Pacific Islanders by 3.1%, American Indians by 5.0%, and non-Blacks by 1.7%. Id. at 33,582. California, with a minority population of 43%, was the most severely affected state: its total undercount was one million.
 
 
 3
 On July 22, 1991, the Secretary notified the public that he would not release adjusted figures. Adjustment Decision at 33,582. The Secretary gave several reasons for his decision, including: (1) it was unclear whether adjusting the figures would improve the accuracy of the census; (2) some localities would gain more accurate figures, but others would lose accuracy; (3) the statistical procedures are unstable and could produce different results and different mistakes; (4) political tampering could result from using statistics to achieve desired results; (5) the release of the figures could disrupt the redistricting process at the state and local level, which was already designed using the official figures; and (6) future censuses could be potentially affected in a way that would discourage full and active participation by the state and localities. Id. at 33,583-84.
 
 
 4
 The Senate brought this action to compel the Secretary to release the adjusted census calculations for the State of California. It claimed that the release was required by the Constitution, the census statutes, 13 U.S.C. §§ 1, et seq., and the Voting Rights Act, 42 U.S.C. § 1973. It did not seek release pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The district court granted a preliminary injunction ordering the release of the adjusted census figures. It concluded that the Senate would be irreparably harmed if it was not provided with the adjusted census calculations for use in the redistricting process. The court found no harm at all to the Department of Commerce, which had already calculated and prepared the adjusted figures, and had even been ready to send them out to the states. We stayed the injunction pending appeal.
 
 STANDARD OF REVIEW
 
 5
 We review jurisdictional questions de novo. See United States v. Moncini, 882 F.2d 401, 403 (9th Cir.1989); Emrich v. Touche Ross & Co., 846 F.2d 1190, 1194 (9th Cir.1988). "The grant ... of a motion for a preliminary injunction is within the discretion of the district court, and the order of the district court will be reversed only if the court relied on an erroneous legal premise or otherwise abused its discretion." Employers Ins. of Wausau v. Albert D. Seeno Const. Co., 945 F.2d 284, 285 (9th Cir.1991). "Questions of law underlying a preliminary injunction motion are reviewed de novo." Id. at 285-86.
 
 DISCUSSION
 
 6
 In reviewing the grant of the preliminary injunction in this case we are faced with two interwoven issues: Was there jurisdiction to grant relief in this case and were there legal grounds upon which relief could be granted? These issues are interwoven because if there was no law under which the Secretary's decision could be reviewed or questioned, then we lack jurisdiction. By the same token, the absence of laws restraining the Secretary's decision not to release the tapes containing adjusted data would also obliterate the foundation upon which the preliminary injunction rested. We will first explicate the principles that support these propositions. We will then examine the law upon which the Senate rests its claims.
 
 
 7
 A. Review of Agency Action.
 
 
 8
 It is a longstanding rule that some agency actions are not subject to judicial review because they are committed to the discretion of the agency itself. That principle is set forth in the Administrative Procedure Act. The Act provides that it will not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As might be expected, the courts have restrained the reach of that exception, for it is a beast that will swallow the whole of judicial review if given the opportunity. Nevertheless, the courts have not rendered the beast toothless. The Supreme Court has said that this exception was designed to apply in "rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-21, 28 L.Ed.2d 136 (1971) (citation omitted). But, rare or not, the Court has made it clear that "an agency decision not to take enforcement action should be presumed immune from judicial review under section 701(a)(2)." Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). As the Court said, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Id. at 831, 105 S.Ct. at 1655. The Court explained that
 
 
 9
 even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.
 
 
 10
 Id. at 830, 105 S.Ct. at 1655. Compare our recent cases on prosecutorial discretion in which we refused review even though decision making was said to violate due process. United States v. Redondo-Lemos, 955 F.2d 1296, 1299-1300 (9th Cir.1992); United States v. Nance, 962 F.2d 860, 865 (9th Cir.1992); United States v. Diaz, 961 F.2d 1417, 1420 (9th Cir.1992).
 
 
 11
 The Court revisited this issue in Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), where it was asked to review the decision of the Central Intelligence Agency to discharge an employee. It reviewed the authority granted to the Director of that agency and determined that the "standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review." Id. at 600, 108 S.Ct. at 2052.
 
 
 12
 The same might be said of an agency decision not to release internal information to the public. It is most difficult to see precisely what legal standards should apply to that determination, if Congress has not undertaken to set forth standards of review. Of course, Congress has adopted FOIA, but this case was not brought under that statute. Indeed, that statute was designed to outline release standards and was needed, in part, because there was no truly meaningful way to compel a release in its absence. At any rate, neither the Constitution itself nor the census statutes has ever been held to be a FOIA. See Houchins v. KQED, Inc., 438 U.S. 1, 15, 98 S.Ct. 2588, 2597, 57 L.Ed.2d 553 (1978).
 
 
 13
 This terrain was recently surveyed by the Seventh Circuit in a census case. Tucker v. Department of Commerce, 958 F.2d 1411 (7th Cir.1992). There the court dealt with an attempt to force the Secretary to adjust the census data itself for much the same reasons as those asserted by the Senate in its attempt to obtain the unreleased information. Even when faced with that substantive claim, the court determined that judicial review was not proper. As it said:
 
 
 14
 It might be different if the apportionment clause, the census statutes, or the Administrative Procedure Act contained guidelines for an accurate decennial census, for that would be some evidence that the framers of these various enactments had been trying to create a judicially administrable standard. There is nothing of that sort, and the inference is that these enactments do not create justiciable rights. The Constitution directs Congress to conduct a decennial census, and the implementing statutes delegate this authority to the Census Bureau. There is a little more to the statutes--they specify a timetable, and a procedure for translating fractional into whole seats--but they say nothing about how to conduct a census or what to do about undercounts. So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a case like this--that you might as well turn it over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness.
 
 
 15
 Id. at 1417-18 (citations omitted). The concurring judge was still more direct in declaring that there was " 'no law to apply.' " Id. at 1419 (Ripple, J., concurring).
 
 
 16
 Other courts have disagreed and have found some law to apply to attacks on census methodology, even though the grant of authority to the Secretary does fairly exude deference. See, e.g., Carey v. Klutznick, 637 F.2d 834, 838-39 (2d Cir.1981); District of Columbia v. Department of Commerce, 789 F.Supp. 1179 (D.D.C.1992); Massachusetts v. Mosbacher, 785 F.Supp. 230, 262 (D.Mass.1992), prob. juris. noted, Franklin v. Massachusetts, --- U.S. ----, 112 S.Ct. 1462, 117 L.Ed.2d 608, argued before the U.S.Sup.Ct. Apr. 21, 1992; Texas v. Mosbacher, 783 F.Supp. 308, 315 (S.D.Tex.1992); City of New York, 739 F.Supp. at 767; City of Willacoochee v. Baldrige, 556 F.Supp. 551, 555 (S.D.Ga.1983); City of Philadelphia v. Klutznick, 503 F.Supp. 663, 675 (E.D.Pa.1980); City of Camden v. Plotkin, 466 F.Supp. 44, 52-53 (D.N.J.1978).
 
 
 17
 While questions of census methodology are somewhat indirectly related to the issues before us, they are not entirely irrelevant to it. If there are serious doubts about a court's ability to review the methodology itself, those doubts must become even more severe when courts are asked to compel the release of calculations based upon a rejected methodology. We will discuss this further when we review the law which the Senate presses upon us. As we will demonstrate, that law is inapplicable, and we are left with none to apply.
 
 B. Injunctive Relief; Serious Questions
 
 18
 The weakness which afflicts the review leg of the case also afflicts the injunction leg. Lacking either the action could not stand; lacking both it cannot even hope to do so.
 
 
 19
 A preliminary injunction may be granted if the moving party shows either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits. Gilder v. PGA Tour, Inc., 936 F.2d 417, 422 (9th Cir.1991); Caribbean Marine Servs. Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988); National Wildlife Federation v. Coston, 773 F.2d 1513, 1517 (9th Cir.1985). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.' " Gilder, 936 F.2d at 422 (citation omitted).
 
 
 20
 If the law is entirely against the position of the requesting party, neither of these alternative tests will permit the issuance of a preliminary injunction. That is the case here. Thus, we need not give lengthy consideration to the question of whether the balance of hardships favors the Senate. We must say, however, that the district court's determination that it does is most problematic. The Senate is decidedly not required to use the census itself when it performs its functions, and is certainly not required to use the data it now seeks. Moreover, a blind use of that data would not even offer the Senate the protection from litigation that it now desires. On the other hand, the Secretary will be forced to release data that he deems questionable, and once the data is released, the Secretary will have lost the whole case for all practical purposes. In general, that kind of judgment on the merits in the guise of preliminary relief is a highly inappropriate result. See University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir.1979).
 
 
 21
 C. Applicable Laws.
 
 
 22
 In its attempt to support its case, the Senate points to the Constitution, the census statutes, and the Voting Rights Act. But its arguments project mere simulacra which vanish as soon as we reach out to touch them.
 
 
 23
 1. The Constitution and the Census Statutes.
 
 
 24
 The Senate argues that because the Constitution provides for a census based upon an "actual Enumeration" of the people in this country, there is a right to an accurate count. See U.S. Const. art. I. § 2. It argues that by the same token, Congress has delegated the task of taking the census to the Secretary and has not only given the Secretary the authority to produce the census "in such form and content as he may determine," but has also directed that the data be reported to the President and to the States. 13 U.S.C. § 141. From this, the Senate reasons, it must be entitled to the adjusted information it now seeks. We think not.
 
 
 25
 The statutes do not define the method by which the Secretary is to do the count, but it is generally expected to be a head count rather than a mere statistical manipulation through the use of sampling and other techniques. See Tucker, 958 F.2d at 1412. That is underscored by the provisions for interim census taking, which explicitly speak to the use of sampling techniques. Those techniques are probably a pragmatic necessity in that instance, given the vast mobilization of people and resources needed to conduct an even somewhat accurate head count. See 13 U.S.C. § 181. Of course, sampling and other statistical methods have their own problems--problems which led to the Secretary's decision to refuse to adjust the 1990 census and, indirectly, also led to this litigation. See Adjustment Decision at 33,582.
 
 
 26
 Be that as it may, the Secretary has, in fact, conducted the census and has reported the results as required by law. This action does not dispute or seek to change that. If it did, it would squarely present the controversy that other courts have wrestled with and which we have already touched upon in Part A of this opinion.
 
 
 27
 All the Senate asks for here is data which will not, and cannot, affect the census itself. The Senate seeks to use census-like arguments to obtain non-head count data which has been mathematically adjusted. In short, it attempts to use the Constitution and the census statutes as freedom of information laws so that it can obtain release of that governmental data. But, as the Supreme Court has said, "[t]here is no constitutional right to have access to particular government information, or to require openness from the bureaucracy." Houchins, 438 U.S. at 24, 98 S.Ct. at 2596 (citation omitted). While Congress can undoubtedly direct release of information, id. at 14-15, 98 S.Ct. at 2596-97, it has not done so in the census statutes.
 
 
 28
 Thus, neither the census statutes nor the Constitution offers a basis for the Senate's demands.
 
 2. Voting Rights Act
 
 29
 The Senate alternatively seeks a basis for release of the adjusted census figures in the Voting Rights Act. 42 U.S.C. § 1973. It claims that the Secretary's refusal to release this information makes it "virtually impossible" for California to comply with the Act. It argues that the Secretary has an implied duty to prevent "the implementation of voting changes (e.g. redistrictings) that would have a 'retrogressive' effect upon minority voting rights in certain jurisdictions, including four counties in California." See 42 U.S.C. § 1973c (Attorney General's obligation to enforce this section which prohibits California from implementing a discriminatory redistricting plan).
 
 
 30
 However, although the argument is daedalian, it is severely flawed. Cf. Tucker, 958 F.2d at 1414 ("The plaintiffs cannot be serious in arguing that the refusal to adjust the headcount violates the Voting Rights Act."). If the State knows that the census data is underrepresentative, it can, and should, utilize noncensus data in addition to the official count in its redistricting process. Garza v. County of Los Angeles, 918 F.2d 763, 772-73 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). It is the state's responsibility, and not the Secretary's, to satisfy the mandates of the Voting Rights Act. See 42 U.S.C. § 1973 (Act provides remedies only against "any State or political subdivision."). The Secretary's data might be interesting, but might still be inaccurate. Indeed, the Secretary expressly stated that a determination that the new calculations would improve the census accuracy could not be made with a sufficient degree of confidence. Adjustment Decision at 33,585. Thus, even that information cannot relieve the state from its own overarching duties.
 
 
 31
 Moreover, the Secretary has no general affirmative duty to provide assistance to the state even if state residents' legally protected rights would benefit. See e.g., DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interest of which the government itself may not deprive the individual.").
 
 
 32
 Finally, the suggestion that the failure to release data interferes with the exercise of the Senate's obligations under the Voting Rights Act is circular. In effect, it assumes that the Secretary has a duty to release the information and dubs the failure to release as an interference with the right to receive it. Of course, the question to be decided is whether the Act imposes that right-duty relationship in the first place. Nothing before us suggests that it does.
 
 
 33
 Therefore, the Voting Rights Act cannot supply a standard upon which we can rest a review of the Secretary's decision.
 
 CONCLUSION
 
 34
 The 1990 census is said to be one of the best ever taken in this country. Despite our large population, approximately 98 percent of the population was counted. Unfortunately, the errors were not distributed proportionally--large numbers of Blacks, Hispanics, Asian-Pacific Islanders, and Native Americans were missed. To its credit, the Senate is troubled by the disparity and by the unfairness it could cause when California is redistricted.
 
 
 35
 We sympathize with the Senate's concerns and with its goal. Unfortunately, it cannot use this action as a means to that end; none of the laws it relies upon give it the right to compel the Secretary to release the tapes. Thus, the preliminary injunction it obtained must be set aside.
 
 
 36
 REVERSED.
 
 
 37
 PREGERSON, Circuit Judge, dissenting.
 
 
 38
 I would affirm Judge Hatter's preliminary injunction. As explained below, I would leave it to the states to determine how best to use the census information in redistricting. Further, I believe that the balance of equities tips sharply in favor of the Senate.
 
 
 39
 A comparison of the results of the Post-Enumeration Survey ("PES") and the official 1990 census data reveals great disparities. The 1990 census missed over 5 million people. While the overall national undercount rate was 2.1%, Hispanics were undercounted by 5.2%, American-Indians by 5%, Blacks by 4.8%, and Asian-Pacific Islanders by 3.1%. Because California has a minority population of 43%, it was the most severely affected state. The PES revealed that the total undercount for California was more than 1 million people.
 
 
 40
 As a result of the PES, statisticians and other experts at the Bureau of the Census recommended to the Secretary that the official census data be adjusted to compensate for inaccuracies. But the Secretary vetoed the recommendation of his professional staff. The Secretary's rationale for his veto seems to me to be superficial. He argues that releasing the adjusted census data would disrupt current redistricting efforts. However, in light of the discrepancy between the official 1990 census and the PES, release of the adjusted census data would actually facilitate redistricting by giving states access to the most accurate source of population data.
 
 
 41
 By refusing to disclose the adjusted census data, the Secretary may have impermissibly interfered with the Senate's duty to redistrict congressional and state legislative seats under the United States Constitution and under the Voting Rights Act. As the majority points out, ante at 979, it is for the state to satisfy the mandates of the Voting Rights Act. The states bear the ultimate responsibility for redistricting. We should therefore leave it to the State of California to determine how best to use the census information. It is not for us, nor for the Census Bureau, to decide whether the data will aid California in its attempt to comply with the Voting Rights Act or to correct inequities in its redistricting.
 
 
 42
 Clearly, the Senate and the public will be irreparably injured by denying the requested preliminary injunction. This injury far outweighs any possible injury the Secretary may suffer. If the adjusted census data are not released, a number of minority groups will suffer a diminution of voting strength. Release of the requested data will serve the public interest by minimizing the risk of dilution of the voting rights of California citizens, especially members of ethnic and racial minority groups.
 
 
 43
 The Department of Commerce, on the other hand, will suffer no harm by releasing the requested information. The magnetic computer tapes containing the requested data were already prepared. In fact, they were ready for mailing when the Secretary decided not to release them.
 
 
 44
 Based on the foregoing, I respectfully dissent.
 
 
 
 [1]
 The methodology is described in Florida House of Representatives v. Department of Commerce, 961 F.2d 941, 943 (11th Cir.1992) and in the Adjustment of the 1990 Census for Overcounts and Undercounts of Population and Housing; Notice of Final Decision, 56 Fed.Reg. 33,582, 33,586-87, 33,630-35 (July 22, 1991)