**Veronica I. CLEMENTS, Regional Director, Thirty–Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**ALAN RITCHEY, INC., Respondent.**

No. C–00–4321–PJH.

United States District Court,
N.D. California.

Sept. 6, 2001.

Veronica I. Clements, National Labor Relations Board, Oakland, CA, for Petitioner.

Paul L. Myers, Charles E. Winfield, Strasburger & Price, Dallas, TX, Paul L. Myers, Charles E. Winfield, Harry G. Lewis, Curiale, Dellaverson, Hirschfeld, Kelly & Kraemer, San Francisco, CA, for Respondent.

## ORDER DENYING PETITION FOR TEMPORARY INJUNCTION

HAMILTON, District Judge.

Now before the court is a petition for interim injunctive relief filed pursuant to section 10(j) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(j). Petitioner Veronica I. Clements, Regional Director of the Thirty–Second Region of the National Labor Relations Board ("the Board"), alleges that respondent Alan Ritchey, Inc. ("Ritchey"), violated the Act by engaging in a widespread campaign of unfair labor practices. Petitioner seeks a temporary injunction pending the Board's final disposition of the claims against respondent, asserting that such relief is necessary to prevent frustration of the Act's purposes by a continuation of the alleged unfair labor practices, or by a delay in the remedying of the alleged unfair labor practices.

## BACKGROUND

Respondent operates the California Mail Transportation Service Center in Richmond, California, and is under contract with the United States Postal Service to inspect, repair, and warehouse mail transportation equipment. On February 29, 2000, Warehouse Union Local 6, International Longshore & Warehouse Union, AFL—CIO ("the Union"), filed a petition for an election, seeking to represent Ritchie's warehouse, processing, container repair, quality, and data department employees. Teamsters Union Local 315 intervened in the election. On April 13, 2000, an election was conducted. Of the 268 eligible voters, 160 cast ballots for the Union, 4 cast ballots for the Teamsters, and 82 cast ballots for neither (a total of 246 ballots cast). The Board certified the Union on April 21, 2000.

Petitioner alleges that shortly after the election, respondent began a widespread campaign of unfair labor practices, including making unilateral changes to employees' wages, hours, and working conditions without bargaining through the Union; bypassing the Union and dealing directly with bargaining unit employees; disciplining employees for their failure to comply with the unilaterally imposed changes in the efficiency standards by which their performance is measured, without first notifying and giving the Union an opportunity to bargain over those disciplinary actions; failing to bargain collectively in good faith with the Union concerning wages, hours, and other conditions of employment; discharging or otherwise disciplining employees because of their union activities or for having selected the Union as their bargaining representative.

Specifically, petitioner alleges that respondent took the following actions during the period from April 13, 2000, through December 2000:

—told an unidentified employee that she could not engage in protected concerted activities;

—promulgated and discriminatorily enforced a no-talking rule;

—began enforcing the efficiency standard for inspectors more harshly than before the election;

—verbally warned employees in the processing department that they must wear safety glasses

—implemented a "safety ticket" program whereby supervisors and employee members of the safety committee progressively disciplined employees for violating safety rules;

—reduced the number of nonworking holidays from six to four by the elimination of Labor Day and Memorial Day.

—implemented a rule requiring that first shift inspectors finish work that had not been completed by the second shift from the day before;

—for one week in May 2000, required employees in the first shift mailbag section of the processing department to start work at 4:00 a.m., rather than at the usual time of 6:00 a.m., resulting in mandatory overtime;

—offered to pay processing department employees triple time for working on Memorial Day if they volunteered to work on Saturday, May 27, 2000, and did not miss any days through June 2, 2000; and allowed the volunteers to change their shift times on May 27, 2000, and work from 4:00 a.m. to 12:30 p.m., rather than the normal hours of 6:00 a.m. to 2:30 p.m.;

—set forth more onerous plant objectives;

—informed employee Kevin Lynch that he would have to perform mechanic work when he had down time from his regular welding duties;

—promulgated more stringent discipline standards and procedures, including progressive discipline;

—promulgated more onerous objectives for the completion of work;

—informed employees that excessive absenteeism, excessive talking, and leaving the work station would not be tolerated and that management would curtail such conduct with progressive discipline;

—informed employees that all time off must be scheduled a week in advance, and that any absence with less than a week's notice would be considered an unexcused absence;

—required employees to work on Friday, July 7, 2000, and Saturday, July 8, 2000, which were regularly scheduled days off;

—changed the job duties of mechanics in the container repair department, and requested employees to sign a memorandum agreeing to the changes;

—changed the shift and number of hours worked by the inventory clerk, and made other changes to the position by transferring employees to other positions and combining two positions into one;

—offered employees the opportunity to enroll in an accident/disability policy;

—more strictly enforced the efficiency rating standard for mechanics in the container repair department;

—hired 20 to 25 temporary employees to perform the work of employees in the bargaining unit in November 2000, and paid such temporary employees wages and benefits different from those paid to employees in the bargaining unit;

—began reducing the number of daily hours worked by the container repair mechanics on a day-to-day, as-needed basis;

—began to more harshly enforce the efficiency rating standard; and

—issued discipline ranging from verbal and written warnings to suspension and termination to more than 90 employees.

The Union filed four charges with the Board, alleging that respondent had engaged in and was engaging in conduct that violated sections 8(a)(1), (3), and (5) of the Act. The first charge, Case 32–CA–18149–

1, was filed on May 11, 2000, and amended on June 9, 2000. The second charge, Case 32–CA–18459–1, was filed on September 25, 2000, and amended on October 16, 2000. The third charge, Case 32–CA–18526–1, was filed on October 25, 2000. The fourth charge, Case 32–CA–18601–1, was filed on November 30, 2000, and amended on January 4, 2001.

Petitioner now seeks a temporary injunction, pending the final disposition of the matter before the Board, to halt respondent's "unlawful conduct designed to retaliate against employees for having selected the Union." Petitioner contends that the actions described above relate to the wages, hours, and other terms and conditions of employment of the bargaining unit, and are mandatory subjects for the purposes of collective bargaining. Petitioner asserts that respondent engaged in the above activities without prior notice to the Union, and without affording the Union an opportunity to bargain with respect to such acts and conduct, in derogation of respondent's duty to bargain in good faith with the selected representative of the employees in the bargaining unit, thereby engaging in unfair labor practices within the meaning of sections 8(a)(1) and (8)(a)(5) of the Act.

Petitioner contends that in engaging in these activities, respondent has discriminated with regard to the hire or tenure or terms and conditions of employment of its employees, thereby discouraging membership in a labor organization and engaging in unfair labor practices within the meaning of sections 8(a)(1) and 8(a)(3) of the Act. Petitioner also claims that respondent engaged in the above-described actions because the employees joined or assisted the Union, or engaged in other protected concerted activities for the purpose of collective bargaining or other mutual aid or protection, and that in so doing, respondent has interfered with, restrained, and coerced employees in the exercise of their rights guaranteed by section 7 of the Act, and has thereby engaged in unfair labor practices within the meaning of sections 8(a)(1) and 8(a)(3) of the Act.

Petitioner requests an order requiring respondent to reinstate employees to their former positions of employment, and to rescind certain rules, disciplinary warnings and suspensions, claiming that without a restoration of the status quo ante, support for the Union will continue to dissipate and the Union will never be able to engage in meaningful collective bargaining with respondent. Petitioner also seeks an order requiring respondent to bargain with the Union in good faith regarding the issuance of discipline under circumstances where there is discretion involved and any contemplated changes to wages, hours, and other terms and conditions of employment.

## DISCUSSION

A. Legal Standard

■ Section 10(j) of the Act provides that, in response to a request for interim relief from the Board's Regional Director ("the Director"), the district court "shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j). In adjudicating a section 10(j) request, the district court "should rely on traditional equitable principles to determine whether interim relief is appropriate." *Scott ex rel. N.L.R.B. v. Stephen Dunn & Assoc.*, 241 F.3d 652, 660 (9th Cir.2001) (citing *Miller v. Calif. Pacific Med. Ctr.*, 19 F.3d 449 (9th Cir.1994) (en banc)).

■ To secure relief under section 10(j), the Director must show either 1) a combination of probable success on the merits and the possibility of irreparable harm (with the required degree of irrepa-

rable harm increasing as the probability of success decreases), or 2) the existence of serious questions going to the merits of the claim, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits. *Dunn,* 241 F.3d at 661. In addition, when deciding a section 10(j) petition, the court must evaluate the traditional equitable criteria " 'through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power.' " *Id.* (quoting *Miller,* 19 F.3d at 459–60). The court must balance the respondent's showing of hardships against the Board's ability to meaningfully adjudicate disputes arising within its jurisdiction. *Id.* Appropriate injunctive relief under section 10(j) can include cease-and-desist orders and interim bargaining orders. *Id.* at 660–61.

**B. The Petition for a Temporary Injunction**

Petitioner requests interim injunctive relief for alleged violations of sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act.

The Act provides, in part, that it "shall be an unfair labor practice" for an employer

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
. . .
(3) by discrimination in regard to hire or tenure of appointment or any term or condition of employment to encourage or discourage membership in any labor organization . . .
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title

29 U.S.C. § 158(a).

Petitioner seeks to restrain respondent from 1) making unilateral changes to employees' wages, hours, or working conditions without notification to and bargaining with the Union and without an overall impasse in negotiations for a collective bargaining agreement; 2) bypassing the Union and dealing directly with bargaining unit employees; 3) disciplining employees for their failure to comply with the changes in the efficiency standards by which their performance is measured; 4) failing to bargain collectively in good faith concerning wages, hours, and conditions of employment with the Union, as the exclusive bargaining representative of the employees in the unit, by making unilateral changes in working conditions without prior notification and bargaining with the Union and without an overall impasse in negotiations for a collective bargaining agreement, and by issuing discipline under circumstances where there is discretion involved as to discipline without first notifying and giving the Union the opportunity to bargain over those disciplinary actions; 5) discharging or otherwise disciplining employees or making any changes in their terms and conditions of employment because of their Union activities or for having selected the Union as their bargaining representative; 6) in any other manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by section 7 of the Act.

Petitioner also seeks an order directing respondent to immediately reinstate discharged or suspended employees Demone Anderson, George Booker, John Chatman, Dante Clement, Merdia Fort, Latosha Green, Theodore Hagaman, Maggie Hales, Marian Howard, Christy Jackson, Daryl Johnson, Armando Leapheart, Michelle Mayse, Sheila McFarland, Mandrell Miller, LaTachianna Pontiflet, Shawndale Quilter, Cheryl Robinson, Melvin Rucker, Lowe Shakesnider, Ardell Shelfo, Deandre Smith, Marcell Spain, and Yolanda Stevens to their former shifts and job classifica-

tions, displacing, if necessary, any workers hired or reassigned to replace those employees.

Petitioner argues that its likelihood of success in the underlying unfair labor practice case, along with the possibility of irreparable harm, the balancing of hardships, and the public's interest, justify the need for injunctive relief. Moreover, petitioner contends that the relief it is seeking is just and proper.

### 1. Likelihood of Success

■ Petitioner contends that the likelihood-of-success prong of the traditional equitable test is a "minimal requirement" and that the petitioner has sufficient evidence to support the unfair labor practice charge. In order to demonstrate the likelihood of success, a party must at least "demonstrate a fair chance of success on the merits." *Miller*, 19 F.3d at 460 (citing *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987)). Where a party shows only a "fair" chance of success, as opposed to a "probable" success on the merits, the party must also show that the balance of hardships tips in their favor and that there are serious questions pertaining to the merits of the case. *Id.* (citing *Senate of California v. Mosbacher*, 968 F.2d 974, 977 (9th Cir.1992)).

■ In determining whether petitioner has shown a likelihood of success, the district court must consider its lack of jurisdiction over unfair labor practices and the deference the court of appeals accords to the Board's decisions. *Id.* Petitioner need only "make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal

theory." *Id.* Moreover, the court must take into consideration that failing to issue the injunction could allow the allegedly unfair labor practice "to reach fruition and thereby render meaningless the Board's remedial authority." *Id.*

In this case, petitioner argues that there is evidence of numerous, repeated violations of section 8(a)(1) and section 8(a)(5) of the Act. Petitioner maintains that policies such as those regarding absenteeism, excessive talking, leaving the work station, the use of safety glasses, and scheduling time off are mandatory subjects of bargaining that can not be unilaterally changed without bargaining with the Union. Additionally, petitioner argues that the discipline imposed under respondent's "unlawfully adopted work rules" is illegal and subject to rescission. Petitioner also contends that the alleged implementation of stricter work rules was taken in retaliation for the Union's victory, and thus constitutes a violation of section 8(a)(3) of the Act.

As set forth above, section 8(a)(1) makes it unlawful for an employer to interfere with, restrain, or coerce employees in the exercise of their section 7 rights.[1] 29 U.S.C. § 158(a)(1). Section 8(a)(1) is the broadest of the subdivisions of section 8(a). Violations of section 8(a)(1) may be derivative (a violation of any of the other four subdivisions of section 8(a)) or independent (acts constituting general interference with section 7 rights but not specifically prohibited by other subdivisions of section 8(a)). *See* 1 P. Hardin, *The Developing Labor Law* 75 (3d ed., 1992). Petitioner alleges that respondent retaliated against and punished its employees for having selected

---

**1.** Section 7 provides that employees "shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other con-

certed activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities...." 29 U.S.C. § 157.

the Union, in violation of both section 8(a)(1) and section 8(a)(3).

■ Section 8(a)(3) prohibits employers from discriminating in any term or condition of employment in order to discourage membership in any labor organization or in order to retaliate against employees for having selected a union to represent them. 29 U.S.C. § 158(a)(3). To prove that respondent violated sections 8(a)(1) and 8(a)(3) as alleged, petitioner must establish facts sufficient to allow the court to conclude that the adverse action taken by respondent against its employees was motivated at least in part by the employees' union activities or other protected concerted activity. *See McGaw of Puerto Rico*, 322 NLRB 438, 449, 1996 WL 655693 (1996) (citing *Wright Line*, 251 NLRB 1083, 1980 WL 12312 (1980), *enf'd* 62 F.2d 899, *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)).[2]

■ Under the rule set forth in *Wright Line*, as modified in *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 276–78, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), a petitioner bears the burden of establishing the employer's motivation, as described above. In the absence of direct evidence, this can be accomplished by showing the existence of protected activity, the employer's knowledge of that activity, and union animus. *FES*, 331 NLRB 20, 21, 2000 WL 627640 (2000). Once the petitioner has met this burden, the burden of persuasion shifts to the employer to demonstrate that the same action would have taken place

even without any protected concerted activity on the part of the employees. *Id.*

■ Section 8(a)(5) of the Act makes it unlawful for an employer to refuse to bargain collectively with the representatives of its employees. 29 U.S.C. § 158(a)(5). In order to establish a prima facie case of a section 8(a)(5) violation, petitioner must show that an obligation to bargain under section 9(a) existed,[3] and that the respondent refused to bargain either directly or did not bargain by unilaterally effecting a change in working conditions. *Peabody Coal Co.*, 265 NLRB 93, 97, 1982 WL 23984 (1982), *enf'd in part, denied in part*, 725 F.2d 357 (6th Cir. 1984). Thus, an employer is under an obligation to bargain with an incumbent union before it may permissibly make unilateral changes in terms and conditions of employment comprising mandatory bargaining subjects. *Id.* The employer's obligation to bargain arises on the date a majority of the appropriate bargaining unit employees select the union as their representative. *Van Dorn Plastic Mach. Co.*, 286 NLRB 1233, 1244, 1987 WL 90063 (1987), *enf'd*, 881 F.2d 302 (6th Cir.1989); *see also Celotex Corp.*, 259 NLRB 1186, 1193 (1982) (duty to bargain, at least in connection with prohibition on unilateral changes, attaches as of the election date).

■ The court finds that petitioner fails to demonstrate "probable success" or even a "fair chance of success" on the merits of the claims. First, with regard to the sections 8(a)(1) and 8(a)(3) claims, peti-

---

**2.** Discrimination that is motivated by an anti-union purpose and which has the foreseeable effect of either encouraging or discouraging union membership violates section 8(a)(3). Proving a specific anti-union purpose is unnecessary, however, where the employer's conduct is found to be "inherently destructive" of section 7 rights. *The Developing Labor Law*, at 190–191.

**3.** Section 9(a) provides, in part, that "[r]epresentatives ... selected for the purposes of collective bargaining by the majority of the employees in a [bargaining] unit ... shall be the sole representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a).

tioner provides no evidence that any specific employees engaged in protected concerted activity. According to the petition, of the 268 workers eligible to vote in the union election, 160—approximately 60%—cast votes for the Union; while 82—approximately 30%—cast votes for neither the Union nor the Teamsters.[4] However, nowhere in the papers does petitioner indicate which employees voted for the Union, or provide evidence that any specific employee worked for the Union, supported the Union, or urged others to join or support the Union. Indeed, petitioner fails to tie a single Ritchie employee to the Union in any way, other than alleging that 160 unidentified workers voted for the Union in the election.

■ Second, there is no evidence that respondent had knowledge of any union activity, apart from the election and the subsequent certification of the Union. For example, petitioner has not pointed the court to any evidence that any of Ritchie's managers or supervisors had knowledge of any specific organizing activity or of any union meetings; there is no mention of employees signing union cards, wearing union insignia, or distributing union literature. While it is true that a finding of knowledge of union participation may be based on circumstantial evidence from which a reasonable inference of knowledge may be drawn, *see Montgomery Ward & Co., Inc.,* 316 NLRB 1248, 1253 (1995), *enf'd,* 97 F.3d 1448 (4th Cir.1996), the evidence is inadequate to support such a finding in this case.

The Board has ruled that knowledge may be inferred based on, for example, the timing of the allegedly discriminatory action, the respondent's general knowledge of union activities, and expressions of anti-union animus by the respondent. *Id.* In this case, however, petitioner provides only

weak support for the first factor—by alleging that the alleged discriminatory actions occurred after the April 13, 2000, election, continuing through to the end of December 2000—and no support for the other factors. Petitioner contends that respondent began making unilateral changes after the Union's election victory, and in response to it, and claims that because all such changes occurred after the election, they must have been prompted by the election. Without more, this post hoc reasoning does not compel an inference that the respondent acted in retaliation against its employees for voting in favor of union representation.

Third, while petitioner alleges numerous adverse employment actions, such as suspensions and terminations, there is no evidence of any connection between those adverse actions and any union activity. Petitioner points to no evidence of anti-union bias, or evidence that respondent intended or attempted to discourage any employee from union activity. Petitioner cites to no negative statements about the Union or about collective bargaining in general made by any Ritchie manager or supervisor. Nor does petitioner provide evidence of any threats made by management to any employee concerning any consequences likely to flow from the union election.

Petitioner argues that it is unnecessary in this case to show that respondent knew of any specific employees involved in union activities, or that any Ritchie manager or superintendent harbored union animus. Petitioner contends that under the theory that respondent more harshly enforced its efficiency standards after the union election in order to retaliate against its employees, who had selected the Union to represent them, it is necessary neither to

---

**4.** Petitioner does not indicate whether these 82 ballots were cast in opposition to unionization, or whether they were cast for another union.

provide direct evidence of union animus, nor to show a correlation between each employee's union activity and his or her discipline or discharge.

Petitioner cites a number of cases in support of the proposition that the Board will infer union animus or knowledge of union activity from the circumstances of a particular case, where direct evidence of the employer's intent to discriminate is lacking. However, none of the cases cited by petitioner presents facts analogous to the facts in the present case, where the petitioner has presented no evidence that even hints at anti-union bias or employer knowledge.[5] For example, in *J.T. Slocomb Co.*, 314 NLRB 231, 1994 WL 326616 (1994), a "mass layoff case," the Board found no independent section 8(a)(1) violation, but found a violation of 8(a)(3) based on statements indicating anti-union bias. In particular, the Board also noted the speed, timing, and number of layoffs, as well as the fact that the employer had requested employees to work overtime, and then almost immediately laid them off after learning that a union organizer had been seen at the facility parking lot.

In *Birch Run Welding & Fabricating*, 269 NLRB 756, 1984 WL 36244 (1984), *enf'd*, 761 F.2d 1175 (6th Cir.1985), the Board noted a lack of direct evidence of animus, but also found sufficient evidence to support an inference that anti-union bias was a motivating factor in its decision to lay off employees. The Board found that the respondent, "although not shown to be frothing with antiunion vituperation," was clearly shown to be adverse—not merely indifferent—to the unionization of its employees. For example, the Board found that immediately before the respondent acquired knowledge of the union organizing, it had indicated its intention to

retain the employees then working at the plant. The Board also noted that there was evidence of immediately observable work available to those workers. After learning of the union organizing, however, the employer quickly laid off a number of workers. In addition, the Board was persuaded by the fact that the employee who first disclosed to respondent that union organizing was taking place was, before the disclosure, promised a raise because of his excellent abilities; but, within a few hours (after the disclosure), was laid off despite the fact that he was in the middle of a job.

In *Hyatt Regency Memphis*, 296 NLRB 259 (1989), *aff'd*, 939 F.2d 361, *enf'd*, 944 F.2d 904 (6th Cir.1991), the Board found that respondent enforced work rules more harshly after a union election than it had before, and found that this action was discriminatory, in violation of sections 8(a)(1) and 8(a)(3), in part because the respondent had plainly indicated union animus by specific preelection threats of strict rule enforcement in the event of a union election victory.

 This case, by contrast, presents none of the above-described circumstances justifying an inference of union activity or of union animus. There is no evidence of any statement by any Ritchie manager or supervisor which even references the Union. There is no evidence of any union activity, apart from the election, let alone evidence that respondent was aware of union activity. The court finds that the mere fact that respondent was aware of the election, without more, is insufficient to establish a fair chance of success on the merits of the anti-union discrimination claim under sections 8(a)(1) and 8(a)(3).

---

5. The court notes, in addition, that in *ACTIV Industries*, 277 NLRB 356 (1985), one of the cases cited by petitioner, the Board specifically did not consider employer motivation in finding a violation of 8(a)(1) and 8(a)(3).

With regard to the section 8(a)(5) claims, the court finds that petitioner fails to demonstrate that respondent implemented any changes in policy after the election, or more harshly enforced any previously existing policies. The Board has adopted the following test for determining whether an employer has committed an unlawful unilateral change: "[W]henever the employer by promises or a course of conduct has made a particular benefit plan part of the established wage or compensation system, then he is not at liberty to change this benefit either for better or worse during ... the period of collective bargaining." *AlliedSignal Aerospace*, 330 NLRB 176, 2000 WL 389449 (N.L.R.B., April 12, 2000) at *20–21. Thus, petitioner must show that the alleged unilateral changes resulted in an alteration of the employer's "former and established practices" with regard to rates of pay, wages, hours of employment, or other conditions of employment. *See Peabody Coal*, 265 NLRB at 99. In this case, because respondent is entitled to enforce policies that existed prior to the union election without bargaining with the Union, any such pre-existing policies cannot form the basis of a section 8(a)(5) claim.

Respondent has provided evidence that the implementation of the policies about which petitioner complains pre-dated the election. For example, the policies regarding safety glasses and the safety ticket program were discussed and established before the election; the policies and actions relating to holidays were controlled by the contract between Ritchie and the Postal Service, which pre-dated the election; the payment of overtime was also authorized by the contract, and respondent's overtime policies did not change after the election; the accident and disability policy had been in effect at Ritchie facilities since 1994, but because the employees at the Richmond facility were hired in August 1999, they became eligible to enroll in the plan only as of May 2000; the policy that employees should finish the pallet left at their station by the prior shift had been in place since January 2000; and Kevin Lynch's job description required him to do other duties, and he had performed mechanic work before the election. In addition, the policies regarding absenteeism, excused absences, talking on the job, and leaving work stations all predated the election, and respondent provides evidence showing that it issued written notices for the purpose of reminding employees of existing policies.

Respondent provides evidence that the changes in the inventory clerk position were made in response to a contract change by the Postal Service and not in retaliation for Union activity. The evidence also shows that respondent had previously utilized temporary workers during busy periods—e.g., during the Holidays—and that it used approximately the same number of temporary workers before the election as it did after the election. Moreover, petitioner offers no evidence of any adverse effect upon other employees as a result of using temporary workers.

With regard to the alleged unilateral changes in production standards, respondent presents evidence that there were no new standards for employees, just overall plant objectives stated in the memorandum. The application of efficiency standards that predate the union election is not unlawful if no new penalties are added. Petitioner neither alleges a change in the standards or in the level of discipline for failing to meet the standards, nor offers persuasive evidence of increased enforcement. Without evidence showing the actual level of efficiency and the circumstances surrounding employees' performance, or evidence regarding the reasons that employees were disciplined, the court cannot

find an indication of stricter enforcement of the efficiency policy.

Petitioner responds, however, that even if an employer maintains pre-existing policies after a union election, it is nonetheless required to bargain over any discretionary aspects of those policies with a newly-certified union. In particular, petitioner argues that until the parties reach agreement on a collective bargaining agreement, or reach an overall impasse in negotiations, respondent is required to give the Union notice and an opportunity to bargain over any discipline imposed on the Ritchie employees, despite any evidence of past practice, because respondent's managers and supervisors exercise discretion in determining whether an employee should be disciplined or discharged.

■ Petitioner relies on *Eugene Iovine, Inc.*, 328 NLRB 39, 1999 WL 298516 (1999), *enf'd*, 2001 WL 10366 (2d Cir.2001), a recent decision in which the Board held that the employer's unilateral reduction in the employees' hours of work violated sections 8(a)(1) and 8(a)(5) of the Act. However, *Iovine*, and the cases on which it relies, concern reduction of hours, layoffs, or changes in work schedules. The *Iovine* decision emphasized that such actions are mandatory subjects of bargaining despite any past practice; in addition, under the facts in the case, the only "past practice" was the absolute discretion given to the employer to reduce employees' hours of work. *Id.* at *6. Such unlimited discretion is not a "practice" which has evolved into a term or condition of employment. *Id.* By contrast, an employer can enforce existing rules or standards regarding discipline or efficiency standards without bargaining with the union. *See The Trading Port, Inc.*, 224 NLRB 980, 983 (1976)

Even under the liberal standard applicable to section 10(j) petitions for temporary injunctive relief, and taking into account the deference given to the Director's decision to pursue this case, the court finds that petitioner has not met the minimal burden of showing even a fair chance of success on the merits.

### 2. Irreparable Harm and Balancing Hardships

Petitioner argues that injunctive relief is warranted because respondent's actions, "by their highly detrimental nature," could "chill" the activities of the Union and the employees' support of the Union. Petitioner asserts that Ritchey employees have begun to question why the Union has been unable to help them and to believe the Union has abandoned them. Petitioner argues that respondent's unilateral and disciplinary changes have signaled to the employees that they will not benefit from their decision to unionize. Petitioner contends that injunctive relief is necessary to "neutralize these threatening and discriminatory messages" and to prevent a loss of employee interest in the Union, which a Board order cannot remedy. Petitioner also asserts that respondent's changes threaten to harm the Union's ability to engage in effective collective bargaining.

■ Parties seeking injunctive relief must show they will be exposed to "some significant risk of irreparable injury" if such relief is denied. *Assoc. Gen'l Contractors of Calif. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir.1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). The more serious the potential injury, the less demanding courts may be in requiring proof of imminent harm. *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir.1989). The court, however, must presume irreparable injury if petitioner has established a likelihood of success. *Scott*, 241 F.3d at 666 (citing *Miller*, 19 F.3d at 460). If petitioner only shows a "fair" chance of success, the court must balance the hardships. *Id.*

■■■■

The likelihood of success must be examined in the context of the relative injuries to the parties. The greater the risk of injury to the respondent if the injunction is granted, the stronger the petitioner's showing on the merits must be. *Steakhouse Inc. v. City of Raleigh, N.C.*, 166 F.3d 634, 637 (4th Cir.1999). Conversely, if the balance of harm tips more towards the petitioner, the petitioner does not need to show as strong a likelihood of success on the merits, although the petitioner must at a minimum have a fair chance of success on the merits. *Aleknagik Natives, Ltd. v. Andrus*, 648 F.2d 496, 502 (9th Cir.1980). "Thus, the necessary showing of likelihood of success on the merits decreases as the balance of hardships increases in favor of the movant." *Id.* (citation omitted). Where petitioner and respondent each make a showing of hardship, the district court must use its discretion in determining which way the balance tips. *Miller*, 19 F.3d at 460.

Because petitioner does not make a strong showing of a likelihood of success, it must show that the balance of harm tips strongly in its favor. The court finds, however, that petitioner's claim that respondent's actions have caused a loss of confidence in the Union is not sufficiently supported to establish a risk of irreparable harm. Moreover, respondent provides evidence that respondent has been meeting with the Union and negotiating changes in the workplace.

■■■ In addition, the burden on respondent, should the court grant the petition, would clearly outweigh any harm to the petitioner resulting from not ordering the injunction. Because the Postal Service is Ritchie's only customer, and controls every aspect of its operation, the workforce must match the amount of work provided by the Postal Service. Forcing respondent to rehire workers without increasing the product would increase costs to the company without increasing revenue. Additionally, reinstating former employees would disrupt the remaining employees, and shifting and demoting current employees would create an imbalance in the shift, forcing some employees to quit or change shifts. Finally, requiring respondent to rescind its policies would disrupt respondent's plant operations with regard to efficiency, attendance, discipline and other issues.

## CONCLUSION

In accordance with the foregoing, the court hereby DENIES the petition for a temporary injunction. This order fully adjudicates the petitions listed at Nos. 1 and 29 on the clerk's docket for this case, and terminates the case and any pending motions.

**IT IS SO ORDERED.**